913 A.2d 89

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT/CROSS–
APPELLANT, v. BREANE STARR BLAKNEY, DEFENDANT–
APPELLANT/CROSS–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued September 28, 2005—Decided January 24, 2006.

304

306

Before Judges CONLEY, WEISSBARD and SAPP–PETERSON.

*Alyssa A. Aiello,* Assistant Deputy Public Defender, argued the cause for appellant/cross-respondent (*Yvonne Smith Segars,* Public Defender, attorney; *Ms. Aiello,* of counsel and on the brief).

*Robyn M. Mitchell,* Deputy Attorney General, argued the cause for respondent/cross-appellant (*Peter C. Harvey,* Attorney General, attorney; *Ms. Mitchell,* of counsel and on the brief).

PER CURIAM.

Defendant, Breane Starr Blakney, appeals her conviction for murder, second degree aggravated assault, third degree child abuse, and endangering the welfare of a child. We affirm defendant's convictions. We also affirm the sentence imposed on the murder and aggravated assault charges but vacate the sentences imposed on the child abuse and endangering the welfare of a child convictions.

The convictions arise out of the tragic death of defendant's six-month-old son, S.B., on September 18, 1999. The cause of death was multiple blunt force injuries due to battered child syndrome.

On October 20, 1999, defendant was charged in Hudson County Indictment No. 1806–11–99 with first degree murder, *N.J.S.A.* 2C:11–3 (count one); second degree aggravated assault, *N.J.S.A.* 2C:12–1(b)(1) (count two); third degree child abuse, *N.J.S.A.* 9:6–1 and 9:6–3 (count three); and endangering the welfare of a child, *N.J.S.A.* 2C:24–4(a) (count four).

On May 10 and May 24, 2000, a hearing was conducted to determine the admissibility of taped statements defendant made to the police. On June 6, 2000, the trial court ruled the statements were admissible.

The trial took place between January 15 and January 30, 2002. On February 1, 2002, the jury found defendant guilty on all counts.

On May 24, 2002, defendant's motion for a new trial was denied and she was subsequently sentenced. Defendant received thirty years imprisonment with thirty years of parole ineligibility on count one, murder; five years imprisonment on count three, child abuse; and ten years imprisonment with an eighty-five percent No Early Release Act (NERA) parole disqualifier on count four, endangering the welfare of a child. The court merged the conviction on count two, aggravated assault, with the sentence imposed on count four. All the sentences were run concurrently.

The evidence presented at trial, if credited, disclosed the following. On September 14, 1999, at approximately 3:30 a.m., defendant brought S.B. to the Jersey City Medical Center (JCMC) Emergency Room because of persistent vomiting. S.B. was examined by Dr. Victor Uduaghan. He noted that S.B. appeared to be sleepy, had a muscular rash, and had a scar on his abdomen. He also found that S.B. did not seem to be dehydrated. S.B. was also examined by Dr. Andrew Sapiro, who diagnosed him as being overfed. The hospital observed S.B. for approximately an hour and twenty-five minutes, during which time he did not vomit. S.B. was sent home with instructions for defendant to decrease feeding and to continue giving him Pedialyte.

When defendant returned home with S.B., she changed his diaper and gave him a bottle. He vomited. Approximately two hours later, defendant gave S.B. Pedialyte, which he also vomited. She again gave him Pedialyte an hour later, which he was able to retain. Defendant called S.B.'s pediatrician, Dr. Carmelita Malalis, and left a message on her answering service. Dr. Malalis denied receiving a phone call. However, testimony by a representative from the doctor's answering service confirmed defendant called the doctor to report that her son's eye would not close, his arm would not move, he was unable to keep anything down and he was six months old.

Later that morning, defendant's friend, Miriam Jones, came to see how S.B. was doing. Jones testified that S.B. was calm, like a baby that wasn't feeling well. She also testified that he had "crust" in his eye as if he had a cold. Jones offered to take defendant and S.B. to her pediatrician, which she did after arriving home from work. While at the office, the pediatrician called an ambulance. The ambulance arrived at approximately 5:30 p.m. and the technicians, Michael Carrig and Jennifer Fragel, found S.B. unconscious, unresponsive, and in marked respiratory distress. Carrig testified that S.B. had one dilated and one small pupil, which indicated swelling of the brain. The technicians then took S.B. back to JCMC.

S.B. was treated by Dr. Isabel Belem, the physician in charge of the Pediatric Intensive Care Unit (PICU). She testified that S.B.'s right pupil was wide open and the left pupil was very small. She also testified that S.B. was lethargic and that his eyes were not reacting to light in the proper way. Dr. Belem stated that she noticed several external injuries, including old burns and scars on his chest and arms, an older lesion on his right ear, bruises on his lower abdomen, a lesion on his left foot and its big toe, and other superficial lacerations.

At approximately 8:00 p.m., a CAT scan was performed on S.B. revealing increased intracranial pressure and herniation syndrome. Dr. Belem concluded that S.B. had suffered a severe head

injury. She also conducted a full body X-ray, which revealed several rib fractures and an old fracture on S.B.'s lower left leg. S.B. was pronounced dead on September 18, 1999, at approximately 10:40 a.m.

Prior to S.B.'s death, Dr. Belem testified that she questioned defendant about the injuries found on S.B., but defendant was not forthcoming. Defendant, however, did tell Dr. Belem that the burn on S.B.'s chest and bruises on his arms were caused when an upright vacuum fell on S.B. when he pulled on the cord. Defendant told Dr. Belem the leg fracture happened during day care.

Regarding the burn, Dr. Belem testified that a normal four-month-old baby does not have the motor skills or strength to grab a cord or pull a vacuum over. Dr. Belem also testified about shaken baby syndrome. She stated it is a condition that develops in babies when they are shaken by the head or chest. Dr. Belem explained a young child's neck muscles are not developed enough to fully control head movement. Thus, when the child is shaken, the movement of the head, especially acceleration and deceleration, also causes movement to the brain which begins to bruise or hemorrhage from hitting the inside of the skull.

Dr. Belem testified that within a reasonable degree of medical certainty, the injuries behind the ear were consistent with those a child would suffer if he had been grabbed by the ears and shaken. She stated most people who shake babies do so out of frustration or anger at whatever is happening with the baby at that particular moment.

After S.B. was admitted to PICU, JCMC contacted the Hudson County Prosecutor's Office Sex Crime/Child Abuse Unit (SAVA). Sergeant Honey Spirito and Investigator Ryan Hadfield responded to the call and were assigned to conduct the investigation. The officers proceeded to the hospital. While waiting to speak to the doctors, who were still intubating S.B. and trying to get him on life support, they introduced themselves to defendant. She agreed to accompany the officers to their office, which was located next door to the medical center, for a taped interview. Spirito

testified defendant was advised of her *Miranda* rights prior to taping her statement and that a pre-tape interview was conducted.

In her statement, defendant discussed S.B.'s various injuries and hospital visits. She told the officers S.B. was first brought to Bayonne Hospital because of a white discharge around the circumcision of his penis. He then was brought back to Bayonne Hospital for his fractured leg. Defendant stated she was told he could have been born with the fracture or that someone could have dropped him. Defendant next discussed the burns. She stated that she was vacuuming and S.B. was in his car seat near the vacuum. As she went to get a bottle, S.B. grabbed the vacuum and pulled it down on himself. She stated that the cord was still in J.B.'s hand when she found him. Defendant never took S.B. to the hospital because he was already scheduled for a doctor's visit the following month. When questioned further as to why she did not take S.B. to the hospital, defendant explained she was scared the Department of Youth and Family Services (DYFS) would take S.B. from her.

Defendant told the officers many people had cared for S.B. the week preceding his September 14, 1999, hospitalization. On Monday, Tuesday, and Wednesday, a friend babysat S.B. while defendant was at work. Defendant was with S.B. all day Thursday and Friday. Defendant's father watched S.B. on Saturday from approximately 2:30 p.m. to 11:30 p.m. On Sunday, S.B.'s biological father, Courtney Hymes, watched him from 8:30 a.m. to midnight. Hymes' mother brought S.B. home, which is when defendant first noticed S.B. was acting differently.

The next day defendant left S.B. with her boyfriend, Rolando Morrison, at about 7:00 p.m. and went to work. She said she called at about 7:30 p.m. to check on S.B. and was told he threw up but that he was sleeping. Defendant arrived home around 11:00 p.m. Morrison told defendant that when he tried to play with S.B., the baby did not respond as he usually did.

Defendant stated she then bathed S.B. and placed him in the bed next to her. Defendant indicated she did not sleep but kept

watching S.B. all night. She would call his name and S.B. would open both eyes, look at her, but then "go right back to sleep." Defendant stated things did not feel right to her so she got up and took S.B. to the hospital at 3:30 a.m. She explained that she took S.B. to JCMC because she heard it was a better hospital for children and because she was afraid Bayonne Hospital would call DYFS. She gave her name as Tina Smith and S.B.'s as Sean Smith so DYFS would not become involved.

Defendant told Spirito and Hadfield she did not notice any bruises, cuts, or scratches on S.B. after Hazel, her father, and Hymes had watched him. She indicated she noticed the marks on S.B.'s feet after Morrison had watched him. When she asked Morrison about the marks, he told her that he had seen them when he changed S.B.'s socks and was going to ask her what they were. Finally, defendant stated she did not know what caused the injuries to S.B.'s ears but that it may have been caused by peeling because S.B. had peeled in the past. The interview concluded with defendant acknowledging the statement was true and voluntary.

Following defendant's statement, Spirito and Hadfield continued their investigation. They spoke with the people defendant had mentioned and on September 15, 1999, took pictures at defendant's home. In their judgment, there were numerous inconsistencies and lies so they decided to pick defendant up on September 17, 1999, to conduct another interview. At this point, defendant had become a target of the investigation. Although defendant was not arrested or in handcuffs, Spirito acknowledged they had decided to change the tone of the second interview and "take it from an interview to [an] interrogation to see why she's lying." Defendant was brought to the SAVA office and was advised of her *Miranda* rights. Spirito testified that at the time of the interrogation, defendant was cooperative, had eaten, and was wearing different clothes from when she was interviewed three days earlier. The jury received copies of the

transcript of the interview and the tape was played. The tape was approximately twelve minutes long.

Prior to the recorded statement but after defendant signed the *Miranda* waiver form, Spirito and Hadfield conducted a pre-tape interview which lasted approximately an hour and twenty minutes. Spirito discussed with defendant the inconsistencies in defendant's statement. During the pre-tape interview, Spirito discussed various ways in which the injuries to S.B. could have been sustained, at which time defendant informed them that it was possible the injuries occurred from the way in which S.B. was placed in his car seat. Spirito testified that during the pre-tape interview, defendant told them she had dropped S.B. into his car seat numerous times. Defendant also demonstrated how she had dropped S.B. into his seat from waist-high. Spirito indicated that according to defendant's demonstration, she did not throw S.B. into the seat.

The transcript of the taped interrogation reveals that defendant was again advised of her rights and the waiver that she had previously signed. Defendant indicated that she understood her rights and the waiver, and wished to speak to the investigators. Defendant was given an oath and swore to tell the truth. When asked if she knew how S.B. might have sustained some of his injuries, defendant stated:

> Um, now that I'm talking to ya, and you've explained things to me, and I've told you things. I'm aware that the injuries that my son gotten could of been by me just trying to place him nicely into his car seat but not knowingly that I placed him a little bit hard.
>
> . . . .
>
> A lot anger with my father, by being mad that Courtney not there, by happening to know I got to go work the next day or knowing I don't have a babysitter, knowing I'm trying my best and I don't know who else I can turn to what else I could so, not purposely.
>
> . . . .
>
> I could have been angry at the fact that I couldn't get a minute to myself for a few minutes. But, it's na, never directly I was mad at him. I could of been mad at his father, I could been by Rolando not responding to me, I could of mad at plenty different things my father yelling at me for something different, my job talking about if I don't come to work I won't have a job it's different things but it's never directly towards [S.B.] that I was angry with.

During this questioning, defendant again stated she did not know what caused the marks on S.B.'s ears, but she speculated she might have caused them from drying his ears too roughly.

After defendant gave the second statement, she was arrested and charged with aggravated assault, child abuse, and endangering the welfare of a child. After S.B.'s death, the murder charge was subsequently added.

Dr. Kenneth Hutchins performed S.B.'s autopsy on September 19, 1999. Dr. Lyla Perez, an expert in forensic pathology, testified as to the autopsy results. She stated that the autopsy revealed a crusted abrasion on the back of the ear, a healed burn mark on S.B.'s abdomen and the lower part of his chest, two healed skin lesions consistent with burns on the right forearm, a healing abrasion or laceration on the cuticle of the first left toe, and marks on the middle of the foot. Although S.B. had no visible marks on his scalp, there were small and scattered bruises on the top of his head. The skull was not fractured, but the right side of the brain had a subdural hematoma or bleeding. Additionally, bleeding was found in the right cerebral hemisphere and hemorrhages on the optic nerves and eyeballs indicating that the baby had been shaken. Finally, there were hemorrhages on the armpit area and chest wall, several healing rib fractures, several recent rib fractures, and a healing leg fracture.

Dr. Perez testified she agreed with the opinion expressed by Dr. Hutchins in his report that within a reasonable degree of medical certainty, S.B. died from "multiple blunt-force trauma due to battered-child syndrome," and that the death was a homicidal death. On cross-examination, Dr. Perez explained that the use of the terminology "battered-child syndrome" instead of "shaken baby syndrome" in Dr. Hutchins' report was a matter of semantics and that in the death certificate that Dr. Hutchins prepared, shaken baby syndrome was mentioned in the description of how the injuries occurred. Dr. Perez further testified that in her opinion, within a reasonable degree of scientific and medical certainty, there had only been one fatal brain injury and it had

occurred within one or two days prior to S.B.'s admittance into the hospital on September 14, 1999.

There was also testimony from Dr. Carmelita Malalis, a pediatrician who had seen S.B. on two occasions for vaccinations. On S.B.'s July 8, 1999, visit to Dr. Malalis, the doctor noticed a burn scar on the baby's abdominal quadrant and right arm. Dr. Malalis testified that when she asked defendant how S.B. had obtained the burns, "she told me that she doesn't know, you know, how the boy sustained those injuries because at the time the boy was with the father but that's—but that the boy was brought to Medical Center for treatment." Dr. Malalis also testified that she had spoken to an emergency room doctor on July 26, 1999 in regard to S.B.'s leg injury (distal tibia and fibula fracture) and had noted that the emergency room doctor and the orthopedic doctor did not think the injury appeared to be the result of abuse.

Latonia Finley, a friend of defendant who babysat S.B. and had known her for approximately ten years, testified that defendant had told her a vacuum had caused S.B.'s burn and that defendant had told her that S.B.'s broken leg was the result of her placing him on her lap wrong, but later told her that it was the result of her putting his shoe on wrong. She also testified that "[y]ou could tell she loved him. But she was very impatient. She didn't have no patience."

Debra Hymes (also called Yvonne), S.B.'s paternal grandmother, testified that when she went with Marcia LaCue to pick up S.B. for their first visit, defendant told her that the burn S.B. had on his stomach had occurred at the Prodigy Day Care Center. However, later on defendant told her it had been caused by a vacuum cleaner. Hymes testified that when she picked up S.B. for their second visit, defendant told her S.B.'s leg injury occurred when "the nurse at the hospital laid him down the wrong way and broke his leg when she was giving him a X-ray." She also testified that defendant told her that DYFS was handling it and that because of the injury, she was going to sue the nurse or the hospital. According to Hymes, defendant also mentioned she was

going to sue the day care center where S.B. had been burned. Hymes indicated she did not notice any new injuries during her third visit with S.B., which occurred in August. She also stated she offered to baby-sit S.B., but defendant declined because she did not want to give Courtney more visitation time.

LaCue confirmed defendant told her and Debra Hymes that S.B. sustained his burn at the day care center.

Joseph Palella, the director and owner of the Prodigy Learning Center, a day care center located in Bayonne, testified that S.B. was never enrolled at the center.

Defendant called Syed Shah, Miriam Jones (also referred to as Marcia or Mimi), Denatrice Patten, Anna Towarewicz, Rolando Morrison, Vera Coples, and John Gilmore as witnesses on her behalf. Shah was the general manager of the KFC where defendant worked and testified that defendant brought S.B. to the KFC once or twice and appeared happy to have a baby, and that according to payroll records, defendant worked on September 13, 1999.

Patten testified she had known and been friends with defendant since high school in 1994 and that she saw defendant a few times a week after S.B. was born. Patten further testified that she saw defendant with S.B. and described the manner in which defendant acted towards S.B. as "very loving, caring; she showed a lot of respect; she was a good mother." Patten explained she thought defendant was a good mother because "[s]he took care of him. He was always fed, clean, happy. He was never sad, nothing like that. And I also trusted her with m[y children]." Patten testified she never saw defendant get angry at S.B., strike him, or act in an abusive way towards him. On cross, Patten testified that defendant told her that Rolando had been with S.B. when the vacuum cleaner fell and burned S.B.

Towarewicz testified she was a switchboard operator and performed answering service duties for doctors, including Dr. Malalis, S.B.'s pediatrician. She testified she took a message from defen-

dant on September 14, 1999, at 10:13 a.m. regarding S.B.'s condition, that the doctor did not return her beeps, that she called defendant, who indicated Dr. Malalis had not called her, and that she had delivered the message to Dr. Malalis.

Morrison, a drug dealer who was incarcerated at the Bordentown Youth Correction Facility at the time of the trial, testified he had known defendant for six years and that they had "a little involvement," "a relationship, basically," "I wouldn't say [she was my girlfriend], but, you know, yeah," "[s]he was my partner," "[s]exual partner." Morrison denied knowing S.B., but then admitted he had seen him. He proceeded to testify he had been sexual partners with defendant in September of 1999 and had babysat S.B. "[o]nce or twice." Morrison testified the prosecutor's office interviewed him twice in connection with S.B.'s death; once on September 15, 1999, and later in August 2000 (also referred to as the August 2001 statement). He testified that on the evening of September 13, 1999, he babysat S.B. and was "[g]etting my rest in." He testified defendant only called once during the evening. However, he conceded that in his statement to the investigators on September 15, 1999, he stated she was calling him every five or ten minutes. When defendant returned home, Morrison left the apartment and went to deal drugs.

Morrison next saw defendant and S.B. at some point during the early morning hours when she came looking for him. Morrison testified that when defendant found him, "[s]he said something, something was wrong with the baby and she was scared. She didn't want to take the baby to the hospital." Morrison denied defendant asked him what he had done to S.B.

When asked if he had ever picked up S.B., Morrison stated "sometimes." When questioned further as to how he would do that, Morrison responded, "It was basically how any male would treat a child." He explained he picked up S.B. "[l]ike a baby" and from under S.B.'s armpits. Morrison told the prosecutor's office he witnessed defendant pick up S.B. from his crib by his head on one occasion. Morrison acknowledged he gave an earlier state-

ment to the prosecutor's office where no reference to this incident was made. According to Morrison, he was trying to protect defendant.

Morrison also testified that when defendant returned from work on the night of September 13, 1999, they had a "discussion" after he was beeped. Defendant thought it was another woman and did not want him to go out.

Morrison indicated that when he was incarcerated, defendant visited him and they exchanged letters. He found out that Gilmore and defendant were having an affair and acknowledged that he wrote letters to defendant containing threatening language. He claimed the threatening language was simply a figure of speech and that he never harmed defendant. He admitted hitting her once while in the visiting area of the prison, but maintained it was just a "tap," noting they were surrounded by correction officers, so it could not have been "big." Morrison also testified defendant was a habitual liar.

On cross, Morrison indicated he often stayed at defendant's place, but he went to his home to change. He testified he gave defendant money to buy things. Morrison denied breaking S.B.'s leg. According to Morrison, defendant told him S.B.'s burn occurred at the day care center and that she broke S.B.'s leg while she was putting on his shoe. At one point, defendant asked him if he had ever hurt S.B. He responded, by letter, asking why would he hurt S.B., as he was a father himself.

Morrison also testified about his relationship with Gilmore, how Gilmore was angry with him, and how they got into a fight while both were incarcerated in the same institution.

Coples testified that she worked with defendant at KFC before S.B. was born and that she became friends with her. She testified on direct that she visited defendant at her home after S.B. was born and that Rolando lived there at the time. However, on cross, Coples testified that the last time she went to defendant's apartment was in April of 1999, and afterward only saw S.B. when

defendant brought him to visit at the KFC in Journal Square where Coples worked. Coples testified that "[defendant] treated him good. She made sure, you know, he eat and he had clean clothes and she made sure he had everything that he needed." She described defendant's demeanor at the hospital on September 14, 1999 as "[v]ery upset, crying, um, coming to me crying, telling me, um, something is wrong with the baby."

Gilmore, a convicted drug dealer incarcerated at Northern State Prison at the time of the trial, testified he met defendant through Morrison, and that Morrison was living with defendant around the time of S.B.'s hospitalization. He stated in the early morning hours of September 14, 1999, he saw defendant carrying S.B. and looking for Morrison. When Morrison approached, Gilmore overheard defendant ask Morrison "what happened to her son, what he did to her son?" Gilmore indicated he went to the hospital with Morrison, defendant and S.B. in a car driven by his friend. After dropping off Morrison, defendant and S.B. at the hospital, he returned to the area he had just left. Gilmore testified that he asked Morrison whether he had "something to do with" S.B.'s death and Morrison told him he had caused the injury to S.B.'s leg when "him and [defendant] was playing and he had picked her up and threw her on top of [S.B.] by accident." Morrison also told Gilmore he had been with S.B. when the vacuum fell on S.B. causing the burn.

On cross, Gilmore conceded he had a "beef" with Morrison over drug money. Gilmore gave Morrison money to bring to his lawyer, but Morrison did something else with the money. Gilmore testified this made him angry. He also testified he got into a fight with Morrison while in prison. Gilmore denied having an affair with defendant and said Morrison was "[l]ying" if he had said that.

Defendant did not testify.

On appeal, defendant presents the following arguments for our consideration.

*POINT I*

THE TRIAL COURT ERRED IN ADMITTING BLAKNEY'S SEPTEMBER 17, 1999, TAPED STATEMENT INTO EVIDENCE BECAUSE IT WAS INVOLUNTARILY GIVEN, AND BECAUSE BLAKNEY ALLEGED THAT DURING A PORTION OF THE INTERROGATION, WHICH WAS NOT ELECTRONICALLY RECORDED, SHE WAS VERBALLY ABUSED AND PSYCHOLOGICALLY COERCED INTO ADOPTING A VERSION OF EVENTS THAT WAS FED TO HER BY HER INTERLOCUTORS (PARTIALLY RAISED BELOW).

*POINT II*

BLAKNEY SUFFERED EXTREME PREJUDICE FROM THE COURT'S FAILURE TO SEVER THE MURDER COUNT FROM THE COUNTS WHICH INVOLVED PRIOR ACTS OF CHILD ABUSE THAT WERE UNRELATED TO THE MURDER. IN THE ALTERNATIVE, BLAKNEY'S MURDER CONVICTION MUST BE REVERSED BECAUSE THE TRIAL COURT DID NOT PROPERLY INSTRUCT THE JURY ON THE PERMISSIBLE USE OF THE PRIOR BAD ACTS EVIDENCE (NOT RAISED BELOW).

*POINT III*

THE PROSECUTOR'S TRIAL TACTICS GROSSLY EXCEEDED THE BOUNDS OF PROPRIETY, THEREBY DEPRIVING BLAKNEY OF A FAIR TRIAL (NOT RAISED BELOW).

*POINT IV*

BLAKNEY WAS DENIED HER RIGHT TO JURY UNANIMITY ON THE AGGRAVATED ASSAULT COUNT WHERE THE STATE FAILED TO ALLEGE SERIOUS BODILY INJURY WITH PARTICULARITY, AND WHERE THERE WAS EVIDENCE OF SEVERAL SEPARATE AND DISTINCT INJURIES, ALL OF WHICH WERE ARGUABLY SERIOUS (NOT RAISED BELOW).

*POINT V*

BLAKNEY'S CONVICTION FOR ENDANGERING THE WELFARE OF A CHILD MUST BE REVERSED WHERE THE TRIAL COURT FAILED TO PROVIDE THE JURY WITH THE DEFINITION OF "KNOWINGLY"—THE REQUISITE MENTAL STATE FOR THAT OFFENSE (NOT RAISED BELOW).

*POINT VI*

THE TRIAL COURT ERRED IN FAILING TO MERGE BLAKNEY'S CONVICTIONS FOR CHILD ABUSE AND ENDANGERING THE WELFARE OF A CHILD (NOT RAISED BELOW).

We conclude the errors alleged in Points IV and V are without sufficient merit to warrant discussion in a written opinion and therefore confine our discussion to the remaining points and the State's cross-appeal. *R.* 2:11–3(e)(2).

## I.

Defendant contends the statement she gave to SAVA on September 17, 1999, was involuntary and a product of psychological coercion.

Two witnesses testified at the suppression hearing. Sergeant Spirito testified on behalf of the State while defendant testified on her own behalf. Following the hearing, the trial judge found that the statement had "remarkable clarity" and that it was given without coercion. She stated:

> The court has had the opportunity to listen to both of the tapes. The court has also had the opportunity to read the text of the tapes and to hear the testimony of Miss defendant.
>
> Certainly the court would be aware, and it would not be unlikely that Miss Blakney certainly at the time of the taking of the second statement, .... [w]ould have certainly had little or no sleep. Would have also had an emotional crisis occurring throughout this period of time.
>
> The court must decide whether in fact that was of such a magnitude to have caused her, number one, to be easily coerced, to put her into a mindset that would have then resulted in her answering questions inappropriately, not correctly, not truthfully, answering questions with answers that were given to her by somebody else and on and on.
>
> If you listen to the two statements, interestingly enough, Miss Blakney does not sound very different except at the end of tape two in which she certainly does cry and does have an emotional few moments which are certainly understandable. She answers the questions, I believe, in both instances with remarkable clarity. And under the circumstances, I do not feel after reading and listening that there was any attempt by members of the Prosecutor's Office to coerce her and nor any attempt by them to put words into her mouth.
>
> Clearly when they were asking questions and there was some hesitation with regard to some of the answers what was done on a few occasions was to suggest variable scenarios.
>
> It appears both from the text and from her tone of voice on the tape that she picked up on those variable scenarios and in some instances chose one that may have fit what her answer was going to be or in some cases didn't choose any of them or corrected the Prosecutor's investigator and said something entirely different or something similar, but not the same.
>
> So the idea that, of coercion here, I think is misplaced. Yes, she was tired. Yes, I am sure she was emotionally strained, but then, again, is not every statement that's taken under these circumstances after a person is arrested and after a person has had some sort of a traumatic event? I mean, I can't think of any statements that would not have built within them some nervousness, some strain, some emotional output by the person who's giving the statement.

We are dealing in the criminal law here. We are dealing with scenarios. Many, many instances that occur, either you take the statements from people who have been alleged victims. We take statements from people who are going to be charged with crimes and they are never without stress in my opinion.

So, if we would use that as a criteria for whether something would be voluntary or not voluntary or knowing or not knowing, I feel that we would probably eliminate all statements. I don't think that is what the case law says.

It is clear that the State can use a statement like this against a defendant, whether that defendant testifies or not, as long as it is voluntary, it is knowing, it was not coerced, she was not unduly influenced.

And, in fact, in this particular case was given her full Miranda Rights. Not once, more than once, was certainly made aware under the circumstances that she was being questioned, anything that she said would be used and could be used against her. She was given the opportunity to have an attorney and on and on.

And in my opinion Miss Blakney knew what she was saying and what she was doing and the emotional aspects, as I said before is real. Yes, I do believe that and I am sure the Jury will as well. But under the circumstances there is nothing involuntary. Nothing coercive or nothing of an undue influence that I can gleam from the statement either by reading it or by hearing it.

In reviewing the results of the *Miranda* hearing, we defer to the credibility determinations of the trial judge. *State v. Locurto*, 157 *N.J.* 463, 474, 724 *A.*2d 234 (1999). We may not "weigh the evidence, assess the credibility of the witnesses, or make conclusions about the evidence." *State v. Barone*, 147 *N.J.* 599, 615, 689 *A.*2d 132 (1997).

The State must prove the voluntariness of any statement with proof beyond a reasonable doubt. *State v. Cook*, 179 *N.J.* 533, 552, 847 *A.*2d 530 (2004) (citing *State v. Bey*, 112 *N.J.* 123, 134, 548 *A.*2d 887 (1988) (Bey II)).

Although the use of psychologically-oriented techniques to conduct custodial interrogations is not inherently coercive, a court must look at the totality of the circumstances to determine whether the statement given was the product of a knowing, voluntary waiver of the right against self-incrimination or "derived from 'very substantial' psychological pressures that overb[ore] the suspect's will." *Cook, supra*, 179 *N.J.* at 562–63, 847 *A.*2d 530. Relevant factors to consider in making this determination include the suspect's age, education and intelligence, advice concerning

constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature, and whether physical punishment and mental exhaustion were involved. *State v. Galloway*, 133 *N.J.* 631, 654, 628 *A.2d* 735 (1993) (citing *Schneckloth v. Bustamonte*, 412 *U.S.* 218, 226, 93 *S.Ct.* 2041, 2047–48, 36 *L.Ed.2d* 854, 862 (1973); *State v. Miller*, 76 *N.J.* 392, 402, 388 *A.2d* 218 (1978)).

■ While the September 17, 1999, interview was less congenial than the September 14, 1999, interview, applying the *Galloway* factors, the record does not support a finding that the nature of the interrogation caused defendant's will to be overborne resulting in a statement that was the product of substantial psychological pressures. *Cook, supra,* 179 *N.J.* at 563, 847 *A.2d* 530.

Defendant was nineteen years old at the time she gave the statement. She was a graduate of Bayonne High School and had attended Berkeley College for two months where she took marketing courses. She was a supervisor at Kentucky Fried Chicken. She acknowledged receiving *Miranda* warnings prior to giving a formal statement, that she understood the questions presented and understood where and why she was being questioned. The judge noted that defendant's demeanor in the taped statements was the same on both September 14, 1999, and September 17, 1999, notwithstanding defendant's complaint during the latter questioning that she was tired and that an unidentified officer spent approximately fifteen minutes yelling at her while the tape recorder was off. Thus, the record of the suppression hearing, coupled with the judge's credibility determination, does not support defendant's contention that her statement was the product of impermissible psychological coercion. We therefore conclude the trial judge did not err in her ruling that defendant's September 17, 1999, statement was admissible.

■ In addition, defendant contends we should adopt the holdings of the Alaska and Minnesota Supreme Courts and find that the entire custodial interview must be electronically recorded for any part of the interview to be admissible. See *State v. Scales,*

518 *N.W.*2d 587 (Minn.1994); *Stephan v. State,* 711 *P.*2d 1156 (Alaska 1985). We disagree. Our Supreme Court has previously declined to adopt a similar rule. *Cook, supra,* 179 *N.J.* at 559–60, 847 *A.*2d 530.[1]

## II.

Defendant next contends that evidence of defendant's prior abusive acts against S.B. would have been inadmissible under *N.J.R.E.* 404(b) if the murder count had been tried separately; consequently, she suffered extreme prejudice from the trial court's decision to join the murder charge with the other offenses. Alternatively, defendant argues that the trial court did not give proper limiting instructions to the jury as to how they could use the prior bad acts evidence.

*Rule* 3:7–6 provides for the joinder of offenses as follows:

Two or more offenses may be charged in the same indictment or accusation in a separate count for each offense if the offenses charged are of the same or similar character or are based on the same act or transaction or on 2 or more acts or transactions connected together or constituting parts of a common scheme or plan. Relief from prejudicial joinder shall be afforded as provided by *R.* 3:15–2.

Pursuant to *R.* 3:15–2, a defendant may move for severance of offenses upon a showing of prejudice that would result from the joinder of such offenses. Defendant did not move for severance of the murder count before trial as required by *R.* 3:15–2(c) and *R.* 3:10–2(c). Thus, her claim must be reviewed under the plain error standard, namely, "whether under the circumstances of [this] case the alleged error possessed a clear capacity for producing an unjust result." *State v. Keely,* 153 *N.J.Super.* 18, 22, 378 *A.*2d 1155 (App.Div.1977), *certif. denied,* 75 *N.J.* 613, 384 *A.*2d 843 (1978).

---

[1] An amendment to *R.* 3:17 was adopted October 14, 2005, requiring that custodial interrogations of suspects for certain offenses, including murder and second degree aggravated assault, be electronically recorded unless the rule provides otherwise. The rule is effective January 1, 2006, for homicide offenses, and January 1, 2007, for other offenses specified in the rule.

■ "[A] key factor in determining whether prejudice exists from joinder of multiple offenses is whether the evidence of these other acts would be admissible in separate trials [under *N.J.R.E.* 404(b)]. *State v. Moore,* 113 *N.J.* 239, 274, 550 *A.*2d 117 (1988).

*N.J.R.E.* 404(b), provides:

Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the disposition of a person in order to show that he acted in conformity therewith. Such evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute.

■ The list of exceptions set forth in the rule, however, is not exclusive. *State v. Stevens,* 115 *N.J.* 289, 300, 558 *A.*2d 833 (1989). "A necessary corollary to the principle that other-[wrongs, or acts] can be admitted to prove any fact in issue—whether or not included among the specific examples set forth in [*N.J.R.E.* 404(b)]—is the requirement that the 'issue' be genuine, and that the other-crime evidence be necessary for its proof." *Id.* at 301, 558 *A.*2d 833. "That evidence is shrouded with unsavory implications is no reason for exclusion when it is a significant part of the proof." *State v. Loftin,* 146 *N.J.* 295, 385, 680 *A.*2d 677 (1996) (quoting *Stevens, supra,* 115 *N.J.* at 308, 558 *A.*2d 833).

■ Prior acts of child abuse unconnected to an underlying charge of murder are relevant to show intent, absence of mistake or accident. *State v. Moorman,* 286 *N.J.Super.* 648, 662, 670 *A.*2d 81 (App.Div.1996); *State v. Elmore,* 205 *N.J.Super.* 373, 384, 500 *A.*2d 1089 (App.Div.1985). Defendant claims, however, that she never raised the defense of mistake or accident. Therefore, in a separate trial on the murder count, the evidence of prior abuse would have been irrelevant. Although defendant did not affirmatively claim "accident" or "mistake," that her actions were accidental or mistaken was clearly implied.

In his opening statement, defense counsel remarked, "[m]y client was 19 years old when this happened. She was a single mother doing the best that she could to raise a child." In his closing statement, defense counsel made the following remarks:

Whoever it was that you find shook this baby, whether it was my client, or whether it was Rolando Morrison or somebody else, I submit to you did not kill the baby on purpose, I submit to you did not know that what was going to happen would kill this baby, whoever it was.

. . . .

Is there evidence in this case that she knowingly or purposely killed her child or that anyone did? I submit to you that there isn't.

. . . .

Remember you're judging at the time a 19–year–old single mother.

Defendant gave the following explanation for S.B.'s injuries:

I'm aware that the injuries that my son gotten could of been by me just trying to place him nicely into his car seat but not knowingly that I placed him a little bit hard[.]

* * * *

[H]e's the one that I, put put [sic] down too hard not even realizing that I was doing it.

Merely because the words "accident" or "mistake" were never expressly used by the defense does not mean that the defense was not raised. Moreover, the evidence of prior bad acts was separately admissible to prove defendant's intent. *See State v. Compton,* 304 *N.J.Super.* 477, 482–83, 701 *A.2d* 468 (App.Div.1997), *certif. denied,* 153 *N.J.* 51, 707 *A.2d* 154 (1998). There was sufficient evidence in the record to demonstrate that defendant, over the course of six months following the birth of S.B., became so overwhelmed with her circumstances that she purposely took out her frustrations on S.B. In her statement on September 17, 1999, defendant explained her frustration:

Q. [s]o about how many times do you think, you might have put him in the car seat too roughly, or slammed him . . .

A. Could be numerous . . .

Q. Into the car seat.

A. Numerous of times he's six and a half months I could of did it a, I say like ah, 50 or 60 times, probably more.

Q. And some of those times you might have been angry?

A. Yes.

Q. Were you angry at [S.B.]?

A. No.

Q. Just, okay.

Q. (Inv.Hadfield) Who were you angry at?

A. I could have been angry at the fact that I couldn't get a minute to myself for a few minutes. But, it's na, never directly I was mad at him. I could have been mad at his father, I could been by Rolondo not responding to me, I could of mad at plenty of different things my father yelling at me for something different, my job talking about if I don't come to work I won't have a job it's different things but it's never directly towards [S.B.] that I was angry with.

Q. But, [S.B.] got sort the . . .

A. But [S.B.] the one that . . .

Q. blunt to this anger?

A. That got the blame for it, he's the one that I, put down too hard not even realizing that I was doing it.

This evidence was clearly probative of defendant's intent. Thus, the trial judge did not commit plain error in permitting the joinder of the child abuse counts and the murder count for purposes of trial.

 Defendant also argues that the trial judge did not properly instruct the jury as to the limited purpose for which evidence of prior abuse could be used. She first argues that the court's instructions were stated in generalities and were vague, confusing, and failed to focus the jury on the relevant issues. Second, she argues that the judge spoke only in vague generalities about the potential for prejudice that exists when claims are tried together. Finally, defendant argues that the court did not explain that the prior acts were relevant only to whether she acted purposely or knowingly. The relevant instructions were as follows:

[I]f I gave a limiting instruction as to how to use certain evidence, that evidence must be considered by you for that purpose only. You cannot use it for any other purpose.

. . . .

There are four offenses charged in this indictment. They are separate offenses by separate counts of the indictment and the defendant is entitled to have her guilt or innocence separately considered in each count by the evidence which is relevant and material to that particular charge based on the law that I have given to you.

During the course of the trial, you heard testimony about certain acts that were allegedly done to and other injuries allegedly inflicted upon [S.B.] on occasions prior to September 14, 1999. You must determine those particular incidents individually and decide whether, in fact, they were inflicted by this defendant. Evidence like that is inadmissible under our Rules of Evidence to show the disposition of an individual to commit a certain act. Our Rules of Evidence specifically state that evidence that a person committed acts on prior or subsequent

occasions is inadmissible, that is, not admissible to prove a person's disposition to commit the crimes for which she is currently charged. The thought being if you found, for instance, that she was responsible for the acts prior to September 14, you cannot then presume because you have found that she may have been responsible for those acts that automatically means she must have committed the crime on September 14th.

Therefore, you may not take this evidence and conclude from it that defendant Breane Blakney is a bad person and, thus, has a disposition which shows that she is likely to have done the act with which she is charged, that is, the homicide of [S.B.]. Evidence of other acts may not be used to show a general predisposition of the defendant to commit a crime. That is not the purpose of allowing the testimony and it should not be considered by you as such.

So when I said before that each of the charges need to be dealt with separately, that is what I mean. You cannot say because a person is guilty of one, that they are then, in fact, guilty of another charge. They each have to be dealt with separately.

. . . .

Now, one further thing before we conclude. Now, I indicated to you previously about the fact that there were four different charges in this case and that they are separate offenses and that they certainly have to be considered separately and, also, that the finding by you of certain facts having to do with one particular charge do not necessarily mean that they would carry over to your finding in a second charge; in other words, because someone may have or you find that the State has proven beyond a reasonable doubt one certain charge here does not necessarily mean that this defendant would have then done all of the others or any one of the others. Because each of them has to be done separately.

Such testimony is really permitted where the evidence may relate to some other fact in issue, including motive, intent, absence of mistake or accident or some other issue.

Here the evidence was admitted because it may bear on the issue of whether it was the defendant's intent to commit the crime charged and it may bear on the defendant's assertion that the acts were committed by accident or by mistake. Whether such testimony is true and whether it does, in fact, bear on such issues is for you to decide.

. . . .

But what you may not do under the circumstances is to consider such evidence as indicative of a general disposition of this defendant to commit the crimes of murder, aggravated manslaughter and manslaughter. You may, however, consider such evidence in its entirety when considering whether Breane Blakney committed the crimes of aggravated assault, child endangerment or child abuse.

■ Defendant did not object to this instruction, and when the trial judge asked whether counsel had "any problem with the charges," defendant's counsel stated "No." Thus, we must consider whether this instruction was clearly capable of producing an

unjust result. *State v. Bunch,* 180 *N.J.* 534, 541–42, 853 *A.*2d 238 (2004).

"Recognizing the special dangers posed by the conflicting impacts of other-crime evidence [the] Court has required that when a trial court admits such evidence, the court must specifically instruct the jury about that evidence's limited relevance." *State v. G.S.,* 145 *N.J.* 460, 469, 678 *A.*2d 1092 (1996). The Court proceeded to admonish that "[o]n admission of other-crime evidence, the court must not only caution against a consideration of that evidence for improper purposes, it must through specific instruction direct and focus the jury's attention on the permissible purposes for which the evidence is to be considered." *Id.* at 472, 678 *A.*2d 1092. Here, the trial judge's instructions to the jury specifically told them how they may use the *N.J.R.E.* 404(b) evidence by specifically directing the jury, "what you may not do under the circumstances is to consider such evidence as indicative of a general disposition of this defendant to commit the crimes of murder, aggravated manslaughter and manslaughter." Earlier in the charge, the judge had identified the evidence which constituted the prior bad acts.

These instructions were not confusing or vague as defendant asserts. Furthermore, defendant's claim that the judge erred by stating she had asserted a defense of accident or mistake is without merit. As noted earlier, while not specifically using the term "accident" or "mistake," S.B.'s accidental or mistaken death at the hands of defendant was clearly implied. Therefore, the judge's instruction that the *N.J.R.E.* 404(b) evidence "may bear on the issue of whether it was the defendant's intent to commit the crime charged and it may bear on the defendant's assertion that the acts were committed by accident or by mistake," did not constitute error, let alone plain error, requiring the reversal of the murder conviction. Finally, while the trial judge did not specifically instruct the jury that the prior evidence of abuse may also be considered to rebut a claim of recklessness, we note that if such an instruction had been given, it would have been as a result of the

State's proffer to admit the evidence to rebut a claim of reckless-
ness. During the charge conference the prosecutor specifically
advised the court that the State introduced the evidence to prove
"specific intent and to rebut the inference of accident or mistake"
on the murder charge and requested, without objection, that the
jury be so instructed. Throughout the trial, the theme advanced
by the defense was that S.B. was not killed "on purpose" or "[I]t is
done out of frustration. That is the trigger that makes it happen."
Thus, it was the defense that introduced the theory of reckless
conduct to the jury, presumably to rebut the State's claim of
purposeful conduct. The trial court's response to this contention
was a jury instruction on the lesser included offense of aggravated
manslaughter. *State v. Savage,* 172 *N.J.* 374, 396, 799 *A.*2d 477.
"Evidence tending to establish defendant's state of mind while the
victim was in [her] custody sheds light on whether the injuries
were incurred either purposely, knowingly, or recklessly and
would be extremely helpful to the jury in its fact-finding mission."
*State v. Sanders,* 320 *N.J.Super.* 574, 592, 727 *A.*2d 1063 (App.Div.
1999), *aff'd* 163 *N.J.* 2, 746 *A.*2d 451 (2000). Therefore, we find no
error in the trial judge's instructions regarding the limited pur-
pose for which prior abuse evidence could be considered.

### III.

Defendant argues that she was deprived of a fair trial due to the
prosecutor's trial tactics, which defendant claims grossly exceeded
the bounds of propriety. This point was not raised below and
defendant did not object to any of the comments.

In assessing whether prosecutorial misconduct re-
quires reversal, a reviewing court must determine whether the
conduct "was so egregious that it deprived the defendant of a fair
trial." *State v. Frost,* 158 *N.J.* 76, 83, 727 *A.*2d 1 (1999) (citing
*State v. Ramseur,* 106 *N.J.* 123, 322, 524 *A.*2d 188 (1987), *cert.
denied, sub nom, Ramseur v. Beyer,* 508 *U.S.* 947, 113 *S.Ct.* 2433,
124 *L.Ed.*2d 653 (1993); *State v. Siciliano,* 21 *N.J.* 249, 262, 121
*A.*2d 490 (1956)). This determination is reached by considering

such factors as: (1) whether defense counsel made a timely objection, and if so, whether the remark was withdrawn promptly; (2) whether the trial judge ordered the remarks stricken; (3) whether the judge instructed the jury to disregard them; (4) whether the remarks constituted legitimate inferences from the facts; and (5) whether the remarks went beyond the facts before the jury. *Ramseur, supra,* 106 *N.J.* at 322–23, 524 *A.*2d 188; *State v. Perry,* 65 *N.J.* 45, 47–48, 319 *A.*2d 474 (1974); *State v. Farrell,* 61 *N.J.* 99, 103, 293 *A.*2d 176 (1972); *State v. Mayberry,* 52 *N.J.* 413, 437, 245 *A.*2d 481 (1968), *cert. denied,* 393 *U.S.* 1043, 89 *S.Ct.* 673, 21 *L.Ed.*2d 593 (1969).

In *State v. Timmendequas,* 161 *N.J.* 515, 737 *A.*2d 55 (1999), *cert. denied,* 534 *U.S.* 858, 122 *S.Ct.* 136, 151 *L.Ed.*2d 89 (2001), the Court acknowledged:

> Criminal trials are emotionally charged proceedings. A prosecutor is not expected to conduct himself in a manner appropriate to a lecture hall. He is entitled to be forceful and graphic in his summation to the jury, so long as he confines himself to fair comments on the evidence presented.
>
> [*Id.* at 587, 737 *A.*2d 55 (*quoting State v. DiPaglia,* 64 *N.J.* 288, 305, 315 *A.*2d 385 (1974) (Clifford, J., dissenting) (citations omitted)).]

Likewise, we have acknowledged that "[a] criminal trial is a swiftly moving dramatic contest which often evokes strong emotions in the participants." *State v. Marks,* 201 *N.J.Super.* 514, 534, 493 *A.*2d 596 (App.Div.1985) (quoting *State v. Bucanis,* 26 *N.J.* 45, 56, 138 *A.*2d 739 (1958), *cert. denied,* 357 *U.S.* 910, 78 *S.Ct.* 1157, 2 *L.Ed.*2d 1160 (1958)), *certif. denied,* 102 *N.J.* 393, 508 *A.*2d 253 (1986). "It is, thus, unreasonable to expect that criminal trials will be conducted without some show of feelings." *Ibid.*

Defendant's counsel failed to object to any of the purportedly improper statements made by the prosecutor during summation or during examination of the witnesses. However, defendant argues on appeal that the aggregation of these improprieties raises them to egregious prosecutorial misconduct warranting reversal. To support this position, defendant cites to *State v. Sherman,* 230 *N.J.Super.* 10, 552 *A.*2d 621 (App.Div.1988) and *State v. Pindale,*

249 *N.J.Super.* 266, 592 *A.*2d 300 (App.Div.1991), *certif. denied* 142 *N.J.* 449, 663 *A.*2d 1357 (1995).

In *Sherman, supra,* we reversed the defendant's convictions because an examination of the prosecutor's summation revealed blatant attacks on defense counsel. 230 *N.J.Super.* at 16–17, 552 *A.*2d 621. We concluded, "[b]y the vehemence of his attack the assistant prosecutor converted the proceedings from a trial of issues by which a fact-finder may weigh the evidence fairly into a vehicle for exacting personal revenge upon defense counsel." *Id.* at 19, 552 *A.*2d 621.

Similarly in *Pindale, supra,* we held that the prosecutor's improper comments constituted an attempt to impugn the integrity of the defense counsel and thus impute guilt to the defendant. 249 *N.J.Super.* at 286, 592 *A.*2d 300. Further, the prosecutor suggested to the jury that there was an impropriety in affording defendant his rights and gave the jury a "not doing your job" warning, which we noted "as [historically] among the most egregious forms of prosecutorial misconduct." *Ibid.* (citations omitted). However, of greatest significance was our ultimate holding:

> Although, in the absence of objection by defense counsel, the excesses of the prosecutor might be considered harmless error and insufficient to qualify as plain error amounting to a miscarriage of justice under the law, when coupled with the admission of the evidence of defendant's conduct after the collision, which we find was improperly admitted especially without any limiting instruction, the aggregate of those errors clearly warrant reversal of defendant's convictions of aggravated manslaughter.
>
> [*Id.* at 286–87, 592 *A.*2d 300 (citation omitted).]

An analysis of the prosecutor's conduct here does not require the results reached in *Sherman* and *Pindale.*

■ Defendant first alleges that during his summation, the prosecutor made the following remarks designed to inflame the jury:

> You don't have the luxury of looking at these photographs and feeling the sorrow and the anger and rage that I feel when I look at them, and if during the course of this trial I let those feelings out because I yelled too loud or because I threw a doll into that seat, forgive me. Every once in awhile I can't remain distant anymore. It just gets the better of you. So I'm sorry if I offended you.

What I suggest is most offensive are these injuries here. The cuticle of the big toe. Not these two puncture marks down here. But these right here. These injuries had to have been purposely inflicted. Doctor Perez said this injury was caused by pinching, it is consistent—Strike that. It is consistent with pinching.

You take a—You take that tiny foot, you grab it underneath by the sole and you jab your thumb into the cuticle, you are going to leave marks on the cuticle and right there from the fingers.

Why the hell would you do that to a child? Why?

Because you're frustrated? Because you don't want to be a mother anymore? I mean, what is most repulsive about this entire case is that we are confronted with the notion that a mother can do this to her child. We are repulsed by that. Motherhood, a more noble avocation you can't find. It is 24/7, all the time. And if you are a single parent, it is worse. It is far worse because you don't even have anybody that you can go to and say: Time out. I need some help.

But there are—there are thousands and millions of single parents of—Stay-at-home parents face the same problems, but at least when the spouses come home they have the opportunity for a break.

But they don't kill their children. They don't burn them. They don't throw them into car seats. They don't grab them by the ears and twist them. They don't punch them in the head or on top of the head. They don't slap them. They don't do that.

She did. And I suggest to you that there is nothing special or nothing so unusual about her situation that gives her the right to take her frustrations out on her child. Nothing.

That is life. Which is why being a single parent is tough. But we don't have a rash of single parents killing their children, now, do we?

I'm done. I could probably go on for, go on to lunch, maybe longer, but I can't look at these photos anymore. I just can't.

Defendant claims that these remarks served no legitimate purpose and were made solely to inflame the jury. In the statement directly preceding the prosecutor's comments about the photographs, the prosecutor stated:

I want to thank you. I want to thank you for sitting here for the past three weeks and looking at horrible photographs. I want to thank you for giving us your solemn word that you would put aside your passion and your prejudice, that you would fully and fairly try this case, and you would return a verdict consistent with the evidence and according to the law.

Defendant's complaint that the statement improperly sought to inflame the jury misconstrued the context in which it was stated. Instead, read as a whole, these statements simply reiterate the instruction given by the judge to the jury that:

> As jurors, it is your duty to weigh the evidence calmly and without passion, prejudice or sympathy. Any influence caused by these emotions has the potential to deprive both the State and defendant of what you promised them, a fair and impartial trial by fair and impartial jurors.

Therefore, this statement was not improper.

Moreover, the testimony of Dr. Perez and Dr. Belem supported the comments made by the prosecutor regarding the injuries S.B. sustained, and a prosecutor is permitted to draw reasonable inferences from the evidence presented. *State v. Nelson,* 173 *N.J.* 417, 472, 803 *A.*2d 1 (2002). The remarks made concerning defendant's frustrations and the difficulties in being a single parent responded to the comments in defendant's September 17, 1999, statement that she sometimes got angry at the circumstances of her life, she never had a moment to herself, S.B.'s father was not there, and she was concerned with work and finding babysitters. The comments also were responsive to those made by defense counsel during his summation regarding Dr. Belem's and Dr. Perez's testimony that "frustration" is a typical cause of "shaken baby syndrome," testimony that defendant would call Finley and Finley's mother because she herself was a kid and inexperienced with child care, and defense counsel's admonition to the jury to "[r]emember you're judging at the time a 19–year–old single mother."

Next, defendant alleges the prosecutor misled the jury by grossly distorting the evidence during summation and alluding to facts not in evidence during the cross of Gilmore. During his summation, the prosecutor stated:

> [Dr. Perez 2] also said the cause of death was battered-child syndrome. What we learned about battered-child syndrome is that one of the many manifestations of it are asymmetrical injuries, which means, as you recall, injuries that are in different stages of healing. I'm going to go through all of those injuries, and I suggest to you that they are in all different stages of healing.

---

2 Defendant erroneously refers to the medical examiner as Dr. Belem in this section, however, a reading of the record indicates that the testimony referenced was from Dr. Perez.

Defendant claims this statement was an unreasonable interpretation of the evidence and that it suggested S.B.'s death resulted from a pattern of abuse, with the prior injuries detailed at trial contributing to his ultimate death. In support of this contention, defendant points to the following portion of the cross-examination of Dr. Perez:

Q. You testified earlier when Mr. D'Andrea was asking you questions that you were familiar with shaken-baby syndrome?

A. Yes.

Q. And you were familiar with battered-child syndrome?

A. Yes.

Q. And you said that they were two different things?

A. Yes.

Q. And yet the diagnosis or cause of death in Dr. Hutchins' report is battered-child syndrome?

A. Well, he also included that it is due to multiple blunt-force injuries and blunt-force injuries includes the shaken baby.

Q. Okay. When you review the entire report and the photographs, is it a safe statement for me to make that what caused [S.B.'s] death was shaken-baby syndrome?

A. Yes.

Q. Okay. That the blunt force, the multiple blunt-force injuries described as battered-child syndrome were the shaking of the baby and the brain bouncing off the inside of the skull?

A. That will be the acute, you know, cause of death. The battered-child syndrome is still a definition that includes different stages of healing in other parts of the body such as fractures of the ribs, fracture of the extremities, healed lacerations, burn, healed burns; that will make this syndrome, okay, which includes also the acute event that in this case was the shaken event.

Q. But the real cause of death, and correct me if I am wrong, in this case was the shaken-baby syndrome, the bouncing of the brain off of the inside of the skull?

A. Correct.

Q. That is what killed [S.B.]?

A. Yes.

Q. Not the broken ankle—

A. No, the broken ankle.

Q. —or any of the other wounds?

A. No, the other wounds, they were healed.

However, the entirety of Dr. Perez' testimony must be examined. The conclusion of Dr. Hutchins' autopsy report, from which

Dr. Perez testified, states that the cause of death was "Multiple blunt force injuries due to battered-child syndrome." On redirect, Dr. Perez opined, within a reasonable degree of medical certainty, that there could have been more than one mechanism of death that caused the blunt-force trauma injuries. She also testified, in her opinion, within a reasonable degree of medical certainty, the bruises on S.B.'s head had occurred simultaneously with the shaking that caused the fatal injury to S.B.'s brain. Thus, the prosecutor's argument was not an unreasonable interpretation of the evidence. Moreover, as the trial judge charged the jury:

> You are judges; you are judges of the facts. And as judges of the facts you are to determine the credibility of the various witnesses as well as the weight to be attached to their testimony. You and you alone are the sole and exclusive judges of the evidence, of the credibility of the witnesses, and the weight to be attached to the testimony of each witness.
>
> Regardless of what counsel may have said or I may have said recalling the evidence in this case, it is your recollection of the evidence that should guide you as judges of the facts.
>
> Arguments, statements, remarks, openings and summations of counsel are not evidence and must not be treated as evidence. Although the attorneys may point out what they think important in this case, you must rely solely upon your understanding and recollection of the evidence that was admitted during the trial.

 Defendant also claims the prosecutor unreasonably interpreted the evidence when he stated:

> Didn't both medical personnel tell us that you grab the child around here and when you do so you break his ribs if you squeeze too hard? That tells us that on more than one occasion, when you couple those old healed broken ribs with the broken leg which is the fracture to the extremity, that tells us she shook that baby on more than one occasion.
>
> It wasn't just an accident. It wasn't just a one-time deal. It tells us it happened more than once.

According to defendant, this statement was a gross distortion of Perez' testimony on cross-examination and redirect:

> Q. But it is something that just happens, isn't it? Someone picks up the child and just out of frustration shakes that child?
>
> A. Yes. You know that could happen, you know, or you can do it, you know, in different times during the day. You know, it can be one occasion or different occasions on the same day or prior occasions and on that occasion was not fatal.
>
> Q. But if there were injuries to the brain, if the blood vessels tore, that would begin this process of injury to the brain that we talked about?

A. Yes.

MR. BEAM: Thank you, Doctor.

MR. D'ANDREA: Thank you.

REDIRECT EXAMINATION BY MR. D'ANDREA:

Q. Doctor, you mentioned acute subdural hematoma during the course of the Cross–Examination. Could you explain what that is?

A. Acute subdural hematoma is hematoma that has no membrane. When the hematoma or the blood clots have a membrane, in that case it is subacute or chronic. Some blood clots may re-bleed, meaning that there is a subdural bleed that did not kill the person, but another trauma, either major or minor, will make that hematoma to re-bleed again or that blood vessel to rupture again, and that is the definition of chronic subdural.

Acute, it happens when there is only one incident and there is no membrane. That is the difference.

Q. And that is the kind of bleed that occurs over the course of days, is that right, or can that occur in hours or minutes?

A. The acute hem—the acute bleeding into the brain, what we call acute subdural, it will be few minutes—I mean few hours or maybe one or two days. After that the membrane will come open and we call it chronic subdural.

Q. Now, you reviewed Dr. Hutchins' postmortem protocol; is that correct?

A. Yes.

Q. You also reviewed the photographs that were taken of the infant's head, skull, brain, and spinal cord; is that correct?

A. Yes.

Q. Did you find any sign of an acute subdural hematoma?

A. All of it was acute. There was no chronic subdural.

Q. So you know from this report that there was no other old brain injury to this child; don't you, Doctor?

A. Yes.

Q. You do know that?

A. I know that the only findings were acute subdural hematoma. No chronic subdural hematoma noted on the external—on the gross or microscopic.

Q. Which means that this baby was not injured prior to this injury that cause his death, is that area; isn't that correct?

MR. D'ANDREA: Objection.

THE COURT: What is the objection?

MR. D'ANDREA: Calls for speculation.

THE COURT: Again, if you can answer that within a degree of medical certainty, then you can certainly answer that question.

A. Yes.

THE COURT: Considering the absence of old injuries, can you answer the question?

THE WITNESS: Considering—Yes. In the brain there is one event that was lethal event.

Q. Lethal; correct?

A. Lethal.

Q. There was one event in the brain that was lethal?

A. Correct.

Additionally, defendant asserts Dr. Perez [3] testified there was no evidence that S.B. had been shaken on more than one occasion. This assertion, however, misconstrues Dr. Perez' testimony.

On direct, Dr. Perez testified that shaken-baby syndrome can produce injuries to the brain, such as the fatal injury S.B. sustained, but that it can also cause fractures to the extremities or ribs. S.B. had sustained a fracture to his leg and had several fractured ribs that were in various healing stages. The leg fracture had occurred approximately two months prior to S.B.'s death. The fact that Dr. Perez testified there were no past injuries to the brain does not mean that S.B. was shaken only once. Instead, a reasonable inference could be drawn from the evidence that S.B. was shaken on previous occasions, resulting in fractured ribs and a fractured leg.

■ Finally, defendant claims the prosecutor improperly put her character for truthfulness at issue by repeatedly calling her a liar. During summation, the prosecutor alleged:

> Pay attention to that instruction when the Court gives it to you and, as she will tell you, proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilty. It is that simple. There is no magic formula. It is just—it is just that.
>
> Is there any doubt that this defendant lied, not once, not twice, not three times, but regularly and routinely?
>
> Rolando Morrison, a real charmer here, Ladies and Gentlemen, told you that she is a habitual liar. And if you look at the evidence that has been adduced concerning her conduct and her statements, I suggest to you that that assessment of her credibility is accurate.

---

[3] Defendant erroneously refers to Dr. Perez as Dr. Belem in her brief. However, the citations to the record, provided by defendant, indicate that the testimony was in fact given by Dr. Perez.

Within your much vast realm of experiences, and by now you have got to know each other a little bit because I know you didn't talk about the case and you talked about all sorts of things, you all have a variety of different experiences and you have come from different backgrounds and you are currently in different situations concerning your personal and your public lives. But isn't there just one universal truth that we all accept regardless of our background; that is, if you have nothing to hide, then there is no reason to lie? Can we accept that as one of the universal principles: If you have something to hide, you will lie?

In the law that is called evidence of consciousness of guilt. That means you are acting with a guilty conscience.

I suggest to you that during the course of the testimony that you've heard this woman knew what she had done, was aware of the consequences of her actions, and was trying to cover up for her own actions; hence, the lies.

I suggest to you and I submit that the evidence has shown that the defendant is a liar; she's not telling us everything that happened, she's not telling us about what else she did not him; and she's not telling us that because she knows what will happen to her.

In *State v. Jenkins*, 299 *N.J.Super.* 61, 690 *A.*2d 643 (App.Div.1997), we noted that "a prosecutor has the right to call to the jury's attention discrepancies in a defendant's testimony and then argue that the defendant was not truthful[.] ..." *Id.* at 70, 690 *A.*2d 643.

Defendant's statements to witnesses called by both the State and the defense were introduced into evidence. Included in these statements were conflicting explanations as to how S.B. sustained his various injuries—in particular, the burns and the fractured leg. In addition, defendant admitted in her taped statement to investigators, that she used an alias when she brought S.B. to the hospital on the morning of September 14, 1999. Furthermore, defense counsel questioned Morrison about whether he told defendant he had "a lot of methods to get the truth out of her." Although Morrison denied making this statement, he volunteered that defendant was a "habitual liar." During his summation, defense counsel referred to defendant's propensity to lie on two separate occasions. "My client told some lies, yes. My client told some lies to different people about how the baby was injured, how the baby was burned, she told different stories." Later, defense counsel stated, "[d]id Breane have a reason to lie about that? Even if it was to cover up for [Morrison]? Sure, she would. And

you know she did." Hence, the prosecutor's comments during summation were proper references to the evidence in the record and in response to defense counsel's summation.

Defendant also argues that portions of the cross-examination of Gilmore and of Patten are further examples of egregious trial tactics by the prosecutor that exceeded the bounds of propriety and deprived her of a fair trial.

■■■ The scope of cross-examination is a matter which is generally within the trial court's control, and deference will be given to the trial court's decision "unless clear error and prejudice are shown." *State v. Martini*, 131 *N.J.* 176, 263–64, 619 *A.2d* 1208 (1993) (quoting *State v. Murray*, 240 *N.J.Super.* 378, 394, 573 *A.2d* 488 (App.Div.1990), *certif. denied* 122 *N.J.* 334, 585 *A.2d* 350 (1990)), *cert. denied*, 516 *U.S.* 875, 116 *S.Ct.* 203, 133 *L.Ed.2d* 137 (1995).

■■■ Defendant contends the prosecutor improperly alluded to facts that were not in evidence when he cross-examined Gilmore. She contends the following testimony, which was elicited from Gilmore after he stated Morrison was lying if Morrison testified that Gilmore had an affair with defendant, was improper:

Q. So you are saying that you never had any contact with the defendant at all?

A. No, sir.

Q. Not even when she came on to you while Mimi had the kids at the Laundromat?

A. She ain't never come on to me.

Q. Okay. If you say so.

Defendant claims this was an improper attempt to undermine Gilmore's credibility because no evidence had been introduced to support the allegation of defendant coming on to Gilmore. However, Morrison had previously testified on both direct and cross-examination that defendant had been unfaithful to him with Gilmore, which had led him to fight "somewhat" with Gilmore. In fact, Morrison testified that he had letters "downstate" from defendant indicating that she was "messing" with "John Boy, John Gilmore." By the time Gilmore testified, there was evidence

before the jury of a romantic relationship between defendant and Gilmore. Therefore, in an apparent attempt to impair Gilmore's credibility, the prosecutor cross-examined Gilmore about the laundromat incident. We see no error in the scope of this cross-examination.

██ Defendant also directs our attention to the prosecutor's cross-examination of Patten. While recognizing that the portions of the cross-examination were proper attempts to impair Patten's credibility on the issue of whether defendant was a good mother, defendant asserts the scope of the following cross-examination exceeded the bounds of proper cross-examination:

Q. During that time did she ever tell you about a serious burn that [S.B.] suffered from?

A. She called me when she got the call from Rolando; that she was at the office and he called and notified her the vacuum cleaner had fell on him.

Q. Oh, excuse me. Rolando burned the baby with a vacuum clear; that is what you are telling this jury right now?

A. That, she—Rolando called and said the vacuum cleaner had fell on him.

Q. And who did you get this information from?

A. Breane.

Q. She told you that Rolando had called her and told her that the vacuum fell on the baby and burned him. That's what you are telling us?

A. Yes.

Defendant argues that the continuation of this line of questioning was improper:

Q. Are you aware that the defendant has told people that the burn occurred—occurred at day care? Are you aware of that fact?

A. No.

Q. Are you aware that the baby never attended day care?

A. No.

Q. Are you aware that the defendant has told medical personnel that the burn occurred while in the care of the biological father, Courtney Hymes?

A. No.

Q. Are you aware that the defendant has told people that she herself burned the baby with the vacuum cleaner?

A. No.

Defendant claims this line of questioning "was not designed to demonstrate that Patten did not know all there was to know about

defendant's performance as a mother. Instead, it was designed to establish that Patten did not know all there was to know about defendant's character for truthfulness.

There is no support for this proposition in the record. Instead, the record supports the State's contention that the questions were properly addressed to Patten's belief and prior testimony that defendant was a "good mother." The following exchange occurred during Patten's testimony on cross-examination that directly followed the aforementioned questions:

Q. If I were to tell you that there was medical testimony in this courtroom that indicated that young [S.B.] suffered from a number of different burns on his body, would that change your opinion about whether or not the defendant was a good mother?

A. No.

Q. Would it change your opinion if you coupled those burns with the broken leg? Would that change your opinion?

A. No.

Q. Would it change your opinion if you coupled the burns and the break with the various versions of events that the defendant has told?

A. No.

Q. Would it change your opinion about whether or not the defendant was a good mother if you learned that medical personnel have testified in this case that [S.B.] suffered from old healed broken ribs?

A. No.

Q. Would it change your opinion if you learned that medical personnel have testified that the infant suffered fatal blunt-force trauma injuries to his head?

A. No.

Q. Would it change your opinion about whether or not the defendant was a good mother if doctors testified that the young infant, this poor child suffered from all of these injuries and it is their opinion that this is considered to be battered-child syndrome?

A. No.

Hence, the prosecutor's questioning was proper as it sought to discredit Patten's opinion of defendant as a "good mother."

In sum, the prosecutor's tactics did not grossly exceed the bounds of propriety or deprive defendant of a fair trial, requiring the reversal of her convictions. *State v. Nelson, supra,* 173 *N.J.* at 472, 803 *A.*2d 1.

## IV.

■ Defendant contends the trial court erred in not merging her conviction for child abuse with the conviction for endangering the welfare of a child. The State agrees, noting that *N.J.S.A.* 9:6–1 and 9:6–3 criminalize the same conduct as *N.J.S.A.* 2C:24–4a. *See State v. N.A.,* 355 *N.J.Super.* 143, 153, 809 *A.2d* 825 (App.Div. 2002), *certif. denied,* 175 *N.J.* 434, 815 *A.2d* 480 (2003). We also agree that the two convictions should have merged.

### *CROSS–APPEAL*

■ In its cross-appeal, however, the State contends the trial court erred in merging the aggravated assault and endangering the welfare of a child convictions because the latter offense implicates a violation of defendant's parental duty, which is not an element of aggravated assault.

■ In determining whether to merge offenses, our Supreme Court has rejected a mechanical approach in favor of considering the goals of the legislature and of fulfilling the protections of the Constitution. *State v. Davis,* 68 *N.J.* 69, 81, 342 *A.2d* 841 (1975). "That approach requires [courts] to focus on 'the elements of [the] crime and the Legislature's intent in creating them,' and on 'the specific facts of each case.' " *State v. Cole,* 120 *N.J.* 321, 327, 576 *A.2d* 864 (1990) (quoting *State v. Miller,* 108 *N.J.* 112, 116, 527 *A.2d* 1362 (1987)).

Our Supreme Court, in *State v. D.R.,* 109 *N.J.* 348, 537 *A.2d* 667 (1988), reaffirmed its ruling in *Miller* that the merger of an aggravated sexual assault conviction under *N.J.S.A.* 9:6–1 and 9:6–3 with an endangering the welfare of a child conviction under *N.J.S.A.* 2C:24–4a was precluded because the endangering the welfare of a child statute was "also directed at the defendant's violation of [her] parental duty." *D.R., supra,* 109 *N.J.* at 377, 537 *A.2d* 667. The same reasoning applies to the merger of the aggravated assault conviction with the defendant's conviction for endangering the welfare of child conviction.

In summary, the convictions are affirmed, as are the sentences imposed on the murder and aggravated assault convictions. The sentences imposed on the child abuse and endangering the welfare of a child convictions are vacated and the matter is remanded for resentencing consistent with this opinion. We do not retain jurisdiction.

WEISSBARD, J.A.D., dissenting.

Fundamental to the moral values of all people, transcending social, religious and ethnic divides, is the precept that no child should die before its time. It is for that reason, and justifiably so, that child homicides provoke such strong reactions. Such was the case of S.B., who died at the age of six months on September 18, 1999. As the majority opinion explains, the baby had sustained numerous other injuries in his brief life before the fatal head trauma that apparently resulted from shaken-baby syndrome. Even so, and especially so, defendant, the child's mother and alleged killer, deserved a fair trial. Regretfully, I am led to the conclusion that there were significant errors in the trial which resulted in extreme prejudice to defendant, and which cause me to dissent.

As the majority points out, S.B.'s autopsy revealed the following injuries: abrasions on the back of both ears; a healed burn mark on the abdomen and lower chest; two lesions consistent with burns on the right forearm, one in front of the armpit and the other below the armpit; an abrasion or laceration on the cuticle of the left first toe; marks in the middle of the left foot; small and scattered bruises on the top of the head; multiple healing rib fractures on the front left side of ribs four and eight, and on the back right side of ribs four, five, six, seven, and eleven, as well as several new fractures; a healing leg fracture; and, finally, the fatal injury to the right side of the brain. The indictment charged defendant with causing her son's death "on or about" September 18, 1999, and charged the other non-fatal injuries as constituting aggravated assault on "diverse dates."

The defense was that the fatal injury had been caused by defendant's boyfriend, Rolando Morrison, who had cared for the child on September 14, the day S.B. was taken to the hospital, where he expired four days later. Alternatively, defense counsel suggested that "whoever" caused the head injury by shaking the baby did not act with the knowing or purposeful intent required for murder.

Not surprisingly, virtually all of the errors which lead me to dissent arose out of the treatment of the prior, non-fatal injuries, on the part of both the prosecutor and the judge. Before turning to those errors, I note my agreement with the majority that the murder count need not have been severed from the aggravated assault and child abuse counts. Clearly, the prior acts, all within the brief life span of this helpless baby, were admissible, at least on the issue of defendant's intent on the murder charge. *N.J.R.E.* 404(b); *State v. Compton,* 304 *N.J.Super.* 477, 482–83, 701 *A.*2d 468 (App.Div.1997), *certif. denied,* 153 *N.J.* 51, 707 *A.*2d 154 (1998). As a result, they would have been admissible even if murder had been the only charge. *State v. Moore,* 113 *N.J.* 239, 274, 550 *A.*2d 117 (1988). To this point, I am in agreement with the majority.

That said, the "unsavory implications," *State v. Stevens,* 115 *N.J.* 289, 308, 558 *A.*2d 833 (1989), of this type of evidence demands careful handling by the trial judge, including close monitoring of the manner in which it is elicited and argued by the prosecutor during the trial and, most importantly, in the instructions to the jury. As the majority notes, the standard was set in *State v. G.S.,* 145 *N.J.* 460, 678 *A.*2d 1092 (1996), where the Court admonished that the trial judge "must specifically instruct the jury about the evidence's limited relevance," *id.* at 469, 678 *A.*2d 1092, and "must not only caution against a consideration of that evidence for improper purposes, it must through specific instruction direct and focus the jury's attention on the permissible purposes for which the evidence is to be considered." *Id.* at 472, 678 *A.*2d 1092. Here, the charge was woefully lacking in these essentials, primarily for a reason that is entirely obfuscated by the majority opinion.

The majority sets out what purports to be the limiting instruction (op. at 329–32, 913 *A.2d* at 106–08) as if it had been delivered all at once. But it was not. The ellipses (op. at 330, 913 *A.2d* at 107) do not reflect that the two sections, the second being introduced with the phrase, "Now, one further thing before we conclude," came at widely separated points in the instructions for reasons which the transcript clearly reveals. After the initial portion (op. at 329–30, 913 *A.2d* at 106–07), in which the judge attempted to tell the jury how it could *not* use the prior injury evidence, i.e., to show disposition, the judge moved on to other instructions, including the use of prior convictions to judge credibility and how to judge expert testimony. At that point, the prosecutor asked for a side bar and pointed out that the judge had omitted an entire page, "the second half," of the 404(b) limiting instruction, which he referred to as "the Cusick charge." *See State v. Cusick*, 219 *N.J.Super.* 452, 466–67, 530 *A.2d* 806 (App. Div.), *certif. denied*, 109 *N.J.* 54, 532 *A.2d* 1118 (1987).[1] The judge immediately acknowledged the error, which had apparently been caused by someone on the judge's staff having left that second page out of the instructions from which the judge was reading. However, rather than go back at once to correct the omission, the judge continued with instructions on the use of character evidence and prior contradictory statements. It was only at that point that the judge seemingly returned to the limiting instruction with the "one further thing before we conclude" remark. Rather than giving the jury the entire instruction at one time, the judge simply gave the omitted second half.

As a result, when the judge delivered the critical charge that prior acts might be relevant, and were being offered, on the issue of intent, the judge's reference to "such testimony," was completely unanchored to the earlier portion of the charge (ten pages of transcript earlier) which had referred to "certain acts that were allegedly done to and other injuries allegedly inflicted upon [S.B.]

---

[1] Interestingly, neither the State nor defendant have cited *Cusick* in their appellate briefs.

on occasions prior to September 14, 1999." While we presume that juries follow instructions, *State v. Manley*, 54 *N.J.* 259, 270, 255 *A.2d* 193 (1969), that legal fiction is premised on the expectation that trial judges give correct and comprehensible instructions. In my view, a critical instruction separated into two halves by some seven pages of transcript does not meet that test, even if it were otherwise adequate, because it assumes entirely too much from the jury.

In any event, the instruction as given, taking each half separately or together, was not adequate in this case. Here, while the charges were properly joined, it was essential for the jury to understand that the pre-September 14 injuries were admissible, without limitation, on the aggravated assault and child abuse charges, but had limited applicability on the homicide count. The concept is tricky enough for lawyers and judges; it may, however, seem quite alien, and at best difficult to apply, to jurors. The need for a clear instruction is beyond question. Therefore, we must examine the instruction carefully to see if it meets the rigorous standard of *G.S., supra.*

After defining the elements of the various charges, and the oral statement given by defendant, the judge turned to the limiting instruction. First, the judge stated that the jury must consider each of the four charges separately based on "the evidence which is relevant and material to that particular charge based on the law that I have given you." So far, so good. The judge then referred to the pre-September 14 injuries and told the jurors that they had to "determine those particular incidents individually and decide whether, in fact, they were inflicted by this defendant." This statement was facially correct but the jurors must have thought it strange since they obviously had to determine whether defendant committed those acts in connection with the assault and abuse charges. Thus, the judge failed at the outset to explain to the jurors that this instruction related to their consideration of the pre-September 14 acts on the murder charge. The confusion then continued by virtue of the judge explaining that "evidence like

that," i.e., the earlier injuries, is inadmissible to show that a person had a "disposition to commit the crimes for which she is currently being charged." Of course, that statement makes no sense since the evidence was admissible on some of the crimes for which defendant was being charged. However, the next sentence stated:

> The thought being if you found, for instance, that she was responsible prior to pre-September 14, you cannot then presume because you have found that she may have been responsible for those acts that automatically means she must have committed the crime on September 14.

If this sentence sought to clear the confusion resulting from the prior sentence, it failed. Defendant rightly criticizes the judge's use of the word "automatically." In this instance, the limiting instruction should have said that if defendant committed the earlier acts, that evidence *may not* be considered on the homicide charge to show that defendant had a disposition to commit murder, not that it could not be "automatically" considered for that purpose. Reasonably understood, the use of "automatically" implied that the evidence could be considered, although not "automatically." In any event, the next two sentences did state the proposition more clearly and properly:

> Therefore, you may not take this evidence and conclude from it that defendant [ ] is a bad person and, thus, has a disposition which shows that she is likely to have done the act with which she is charged, that is, the homicide of [S.B.].
>
> Evidence of other acts may not be used to show a general predisposition of the defendant to commit a crime. That is not the purpose of allowing the testimony and it should not be considered by you as such.

However, the judge then said:

> So when I said before that each of the charges need to be dealt with separately, that is what I meant. You cannot say because a person is guilty of one, that they are then, in fact, guilty of another charge. They each have to be dealt with separately.

That final paragraph is wrong. Indeed, it so muddies the preceding statements as to destroy their efficacy. The judge was, simply, mixing apples and oranges. The instruction that each charge must be considered separately is not the same as an instruction dealing with the limited admissibility of 404(b) evidence on the murder charge. If the jury took the judge at her word,

that "that is what [she] mean[t]" in the proceeding paragraphs, they could only have been hopelessly confused. Did the judge mean only that the charges were to be considered separately, and nothing more? Of course, any possibility that the rest of the limiting instruction could clear the air was removed by the judge's inadvertent omission of the remainder, to which she returned after several intervening instructions.

In returning to the limiting instruction, the judge began again with the admonition to judge each charge separately[2] but then continued by, as noted earlier, stating that "such testimony is really permitted where the evidence may relate to some other fact in issue, including motive, intent, absence of mistake or accident or some other issue." And while I agree that intent was in issue, I remain ambivalent about whether, as the majority writes, accident and mistake were implicit in the defense. What is clear is that a judge cannot just read the laundry list of 404(b) exceptions. *State v. Sanders,* 320 *N.J.Super.* 574, 584–85, 727 *A.*2d 1063 (App.Div. 1999), *aff'd o.b.,* 163 *N.J.* 2, 746 *A.*2d 451 (2000). Nevertheless, the judge did proceed to clear away the unnecessary terms and instructed that "the evidence" (still undefined) was admitted on the issues of intent, accident or mistake. The rest of the instruction was beyond reproach.

It is not necessary to decide whether this limiting instruction would have passed muster if delivered in one piece, in order to conclude that a reversal is required. An instruction that was absolutely essential to a fair resolution of the charges was severed, and unlike a worm, the two portions could not survive independently. As the Court has stressed, a 404(b) limiting instruction " 'should be formulated carefully to explain precisely the permit-

---

[2] As defendant points out, the judge's introductory language was also problematical in its use of the phrase, "does not necessarily mean." Thus, the judge indicated that a finding of guilt on one charge "does not necessarily mean" that the defendant committed the other crimes. In fact, a finding on one charge has no impact on the other charges, that being the essence of an instruction to consider each charge separately.

ted and prohibited purposes of the evidence, with sufficient reference to the factual context of the case to enable the jury to comprehend and appreciate the fine distinction to which it is required to adhere.' " *State v. Cofield,* 127 *N.J.* 328, 341, 605 *A.*2d 230 (1992) (quoting *State v. Stevens,* 115 *N.J.* 289, 304, 558 *A.*2d 833 (1989)). Despite there having been no objection, the absence of a correct instruction was "clearly capable of producing an unjust result." *R.* 2:10–2.

The need for a correct limiting instruction in this case is underscored by the prosecutor's actions, a number of which exceeded the bounds of fair advocacy. In summation, the prosecutor suggested to the jury that S.B.'s death was caused by a combination of injuries including those leading up to September 14. I reject the State's suggestion that these remarks were a fair inference from the evidence or that they were merely intended to demonstrate defendant's intent. Contrary to the majority, it seems clear to me that, putting aside some ambiguous statements, the expert testimony was that S.B. died as a result of a single act of violent shaking. His prior leg fracture, burns and other injuries, all of which were described as battered-child syndrome, did not contribute to his death, although some of the rib fractures, as well as the ear abrasion, might have been related to the shaking. I am not prepared to conclude that these misstatements, not objected to, constitute reversible error. However, the confusion engendered by the multiple injuries and the multiple counts of the indictment was aggravated by the prosecutor's at best ambiguous closing argument, thereby emphasizing the need for a carefully tailored, complete and forceful limiting instruction.

Other parts of the prosecutor's summation were also problematical. The prosecutor called the defendant a "habitual liar," and improperly personalized his closing by referring to the "anger and rage that I feel when I look at [the photographs of S.B.'s injuries]" and, in conclusion, that "I can't look at these photos anymore. I just can't." The majority finds the statements "not improper"

when placed in context (op. at 336, 913 *A*.2d at 111). Regardless of context, I cannot agree.

Defendant was a nineteen-year-old single mother; S.B. was her only child. She lived alone with the child and worked at KFC from 4:00 p.m. to 11:30 p.m. on Monday, Tuesday, Wednesday, Saturday and Sunday. While she worked, various people babysat. There was evidence that she took care of the child, and indeed it was defendant herself that brought S.B. to the hospital on September 14 and then later to the pediatrician's office after the hospital, quite remarkably, discharged the infant. Defendant had taken her child to the hospital for a variety of ailments in March, April and July 1999. In July, defendant took S.B. to Dr. Malalis, a pediatrician, twice for vaccinations, and she called Dr. Malalis at 10:30 a.m. on September 14 but only reached her answering service. Indeed, the service tried unsuccessfully to contact Dr. Malalis. All of this is not to minimize the harm caused to S.B., both before and on September 14, but to emphasize that this was a close case, at least in the sense that a manslaughter verdict would have been well supported by the evidence. That the jury found defendant guilty of murder was, in my view, likely the result of the errors I have identified with respect to the handling of the 404(b) evidence. Accordingly, I respectfully dissent.[3]

---

[3] I have no quarrel with the majority's disposition of defendant's arguments as to (1) her taped statement, (2) the failure to properly charge endangering, and (3) the merger of the endangering and child abuse convictions, nor with its disposition of the State's cross-appeal. And, while I would not find it to constitute plain error, I agree with defendant that third-degree aggravated assault should have been charged as a lesser offense under count two.