286 N.J. Super. 648 (1996)
670 A.2d 81
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
SHARON MOORMAN, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted November 13, 1995.
Decided January 25, 1996.
*651 Before Judges PETRELLA, P.G. LEVY and EICHEN.
*652 Susan L. Reisner, Public Defender, attorney for appellant (Thomas Menchin, Designated Counsel, of counsel and on the brief).
Edward F. Borden, Jr., Camden County Prosecutor, attorney for respondent (Robin A. Hamett, Assistant Prosecutor, of counsel and on the brief).
The opinion of the court was delivered by PETRELLA, P.J.A.D.
A jury convicted defendant Sharon Moorman of second degree manslaughter, N.J.S.A. 2C:11-4(b), as a lesser included offense of a charge of first degree murder of her twenty-two-month-old daughter. The trial judge sentenced Moorman to ten years in prison, three years without parole eligibility. A $500 Victims of Crimes Compensation Board penalty was also assessed.
On appeal, filed nunc pro tunc, Moorman raises the following issues:
I. Highly prejudicial "other crimes" evidence was improperly admitted during the trial.
(A) The court erred in finding sufficient evidence that defendant was responsible for the prior offenses, assuming arguendo that there were prior offenses.
(B) The court erred in concluding that the probative value of the evidence outweighed its potential for prejudice.
II. There is no basis in the record for recognition of battered child syndrome, at least as defined by the State's expert, and he should not have been permitted to offer an opinion that the deceased was a battered child.
III. The sentence of ten years with a parole ineligibility of three years was excessive.
Predicated on the proofs presented during the trial, the jury could well have found the following facts. At about 8:00 a.m. on January 21, 1990, emergency medical technicians (EMTs) arrived at Moorman's residence at 1559 Norris Street in Camden. They observed a toddler, later identified as Labria Moorman, defendant's twenty-two-month-old daughter, lying face up on the living room floor. Her body was described as stiff, her skin cool and cyanotic. She was in cardiac arrest, neither breathing nor having *653 any pulse. Attempts to resuscitate Labria both before and after her transportation to a nearby hospital were unavailing. At the hospital, Dr. Attawell concluded that she had been dead for a considerable length of time and that further attempts at resuscitation were futile.
Upon examination, the doctor noticed multiple bruises about Labria's torso, arms, abdomen, lower belly and chest, as well as a circular, non-healing ulcer on the top of her left foot. She also discovered scarring on Labria's left and right buttocks and on her left inner elbow and lower arm, as well as bruising from the base of her right thumb to her right shoulder. The bruising and scarring appeared to be of varying colorations. Chemical analysis of an incontinent stool found in Labria's diaper revealed blood in her feces, indicating an abnormality in the bowel causing blood to flow into it.
Dr. Attawell concluded that the trauma suffered by the infant was of suspicious origin and queried Moorman about Labria's condition. Moorman indicated that Labria had been suffering from a fever and cold symptoms during the five days before January 21, 1990. In response to the doctor's inquiry about any injury which might have caused the bruising and scarring, Moorman replied that two days earlier Labria had fallen down a flight of stairs, but "seemed okay" after the fall. Moorman also said that Labria had fallen down a flight of stairs about a month earlier and was treated at a different hospital. When the doctor informed Moorman that her daughter had died, she became upset.
The county medical examiner was advised of the doctor's suspicions. The police then went to the hospital to interview Moorman. Moorman, who was not then in custody or under arrest, told the officers that Labria had fallen down the stairs in their home on January 18, but was not taken to the hospital because she did not appear to require medical attention. She also told the police that Labria had fallen down the stairs two or three weeks earlier and was admitted to an emergency room for examination and treatment.
*654 Moorman told the police that she and her live-in boyfriend, Rodney Rogers, had had a heated argument on January 20 about his leaving her residence to socialize later that night. After Rogers left, she fell asleep on the sofa with Labria next to her. Moorman indicated that when she awoke, Labria was not on the sofa but lying on the floor. Although Labria was cold, Moorman said she thought the child had a faint heartbeat. Consequently, she ran to a neighbor's home to telephone the police, which resulted in the EMTs' arrival.
The Assistant County Medical Examiner, Dr. Robert L. Catherman, performed an autopsy on January 21, 1990. Photographs were taken during the autopsy. The examination revealed that blunt force had caused the sheering of the mesentery of Labria's bowel, resulting in a lack of blood flow to the bowel and the eventual failure of the heart. The police were told that the type of injuries that were observed in the autopsy could not have occurred by a fall down stairs.
A follow-up interview was conducted on January 22 with Moorman after she was advised of her Miranda[1] rights. Moorman indicated that she understood each of her rights, and signed the back of a card from which a police officer had read those rights to her. The officer then dated the card and entered the time as 2:30 p.m. When the officer informed Moorman that Labria's death had been ruled a homicide, Moorman cried and repeated that Labria had twice fallen down the stairs. Moorman also described an incident in which she had picked up Labria by the waist and had shaken her after she had disobeyed an instruction not to leave the sofa because a nearby table had been sprayed with furniture polish. Moorman became upset and spontaneously told the officers that she had neither intended to hurt Labria nor wanted her to die.
*655 Moorman agreed to give the police a tape-recorded statement of what she had just told them, and the police again advised her of her Miranda rights. She repeated her understanding of those rights and gave a recorded statement consistent with her unrecorded statement. Moorman was then charged with and arrested for murder. The statement, as well as the autopsy photographs (converted into slides), were admitted into evidence at trial.[2]
The trial judge held a Rule 104 hearing on the State's request to allow its medical expert to render an opinion as to whether Labria had suffered from the "battered child syndrome" in order to support the admission, as prior acts evidence under N.J.R.E. 404(b), of Moorman's prior abuse of the child. This testimony was allowed. Although the judge conceded that the slides were unsightly, he determined that any explanation of Labria's injuries would be incomplete without relevant pictorial aids. The judge had asked the jurors during voir dire whether they could look at graphic medical photographs without being inflamed, with those responding negatively being excused.
At the hearing, after a thorough voir dire, the court recognized the assistant county medical examiner as an expert in the Battered Child Syndrome (BCS).[3] The doctor stated that BCS, which referred to the physical, mechanical abuse of children, had gained acceptance in the medical community over the past two or three decades, noting that the American Academy of Forensic Sciences and the National Association of Medical Examiners have both recognized BCS. The doctor described the "classic" case of BCS as one in which the victim exhibits multiple injuries of varying *656 ages to the head or abdomen.[4]
Dr. Catherman's testimony before the jury essentially tracked that at the voir dire hearing. He reviewed the various autopsy slides, which showed the extent of the injuries to Labria, including old and new bruises and scars. He explained that the non-healing ulcer on Labria's left foot was a traumatic-type injury. He further attributed the creation of five separate abdominal bruises to blunt force. Likewise, Dr. Catherman diagnosed scarring across both of Labria's buttocks as caused by a healing traumatic injury, rather than diaper rash. The doctor also noted that the interior of the abdominal walls was bruised. The slide of the interior of Labria's chest and abdomen showed where some sixteen inches of mesentery was stripped from the bowel due to the force of a fairly substantial trauma, and how blood had found its way into the child's stool through the tear.
As a result of his autopsy on Labria, Dr. Catherman opined that, to a reasonable degree of medical certainty, the cause of the child's death was multiple injuries to her abdomen, and the manner of death was homicide. Dr. Catherman concluded that blunt force trauma had caused the abdominal injuries to Labria, which tore mesentery from her bowel and started internal bleeding that led to her death. The doctor testified that Labria's abdominal injuries, when viewed in the context of her other injuries and in light of his experience and training, were indicative of BCS. He rejected the hypothesis that the injuries could have been caused by a fall down stairs. He said that, in his more than twenty years of experience, the overwhelming majority of abdominal injuries suffered by children had resulted from abuse, not accidents.
*657 The judge instructed the jury that it could only use the expert testimony of prior injuries as evidence that Labria's death was not caused by a fall down stairs, and not as evidence of any predisposition by Moorman to commit the crime. The judge advised the jury that it was not bound to accept the doctor's testimony as credible evidence as to whether or not Labria's death was accidental. The judge cautioned the jury that even if it concluded that Labria was a victim of BCS, and had died because of repeated physical abuse, it could not return a guilty verdict unless it was convinced beyond a reasonable doubt that Moorman had inflicted the injuries.
Defendant's expert witness, Dr. Louis Roh, the Deputy Chief Medical Examiner of Westchester County, New York, agreed that Labria had died of blunt force trauma to her abdomen. He maintained, however, that Labria's injuries were consistent with Moorman's contention that the child had fallen down stairs. He opined that the injuries about Labria's torso and arms were all approximately three to four days old, which was consistent with the time that Labria had allegedly fallen down the stairs. Based upon his familiarity with BCS, he contradicted Dr. Catherman's testimony by concluding that there was no evidence of BCS in this case because there were no serious head injuries, skeletal injuries, or, in his opinion, bruises of varying ages.
On cross-examination, Dr. Roh conceded that he had not seen Dr. Catherman's autopsy photographs before concluding that Labria had not suffered from BCS. He also admitted abusive parents often use "falling down stairs" as an excuse to conceal abusive conduct.
In the jury charge, the judge reiterated his former instructions, including that the BCS evidence could only be used as proof that Labria's death was not accidental.

I.
Whether BCS presents a valid, reliable basis for admission of expert testimony presents a somewhat novel question in this jurisdiction. N.J.R.E. 702 provides:

*658 If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.
This rule sets forth three requirements for the admission of expert testimony:
(1) [T]he intended testimony must concern a subject matter that is beyond the ken of the average juror; (2) the field testified to must be at a state of the art such that an expert's testimony would be sufficiently reliable; and (3) the witness must have sufficient expertise to offer the intended testimony.[5]
[Nesmith v. Walsh Trucking Co., 123 N.J. 547, 548, 589 A.2d 596 (1991) (citing State v. Kelly, 97 N.J. 178, 208, 478 A.2d 364 (1984))].
For expert testimony to be considered reliable, the proponent of the testimony must demonstrate its general acceptability as scientific evidence. See State v. Kelly, 97 N.J. 178, 208-209, 478 A.2d 364 (1984). Kelly explained that a party may prove acceptability through presentation of expert testimony by one within the expert's field or profession, submission of authoritative legal and scientific literature, or citation to judicial opinions. Id. at 209, 478 A.2d 364.
The trial judge here properly recognized BCS as a valid scientific premise underlying Dr. Catherman's expert opinion. First, Dr. Catherman testified during voir dire that BCS is generally recognized in the medical profession on a multi-disciplinary level. Even Dr. Roh testified at trial that BCS has been a recognized medical condition since the early 1960's. BCS was apparently first coined as an expression by Dr. C.H. Kempe in his seminal article, The Battered-Child Syndrome, 181 JAMA 17 (1962). Orfinger, Battered Child Syndrome: Evidence of Prior Acts in Disguise, 41 Fla.L.Rev. 345, 346 (1989). The term was used to "describ[e] a pattern of serious and unexplained manifestations of physical abuse" in children. Ibid. Such manifestations include poor general health, malnutrition, multiple soft tissue *659 injuries, poor skin hygiene, subdural hematoma, and long-bone skeletal fractures in various stages of healing. Id. at 350.
Second, there is sufficient, authoritative legal and medical literature to substantiate the conclusion that BCS has been widely accepted in the medical community.[6] Although specific treatises were not discussed during voir dire, Dr. Catherman testified at trial as to specific literature dealing with BCS and the type of abdominal injuries present in this matter.[7]
Third, numerous other jurisdictions have accepted BCS as a reliable scientific premise. See e.g., United States v. Boise, 916 F.2d 497, 503 (9th Cir.1990), cert. denied, 500 U.S. 934, 111 S.Ct. 2057, 114 L.Ed.2d 462 (1991); United States v. Bowers, 660 F.2d 527, 529 (5th Cir.1981); State v. Moyer, 151 Ariz. 253, 727 P.2d 31, 33 (Ct.App. 1986); People v. Jackson, 18 Cal. App.3d 504, 95 Cal. Rptr. 919, 921-922 (1971); People v. Ellis, 41 Colo. App. 271, 589 P.2d 494, 496 (1978); State v. Dumlao, 3 Conn. App. 607, 491 A.2d 404, 409 (1985); Smith v. State, 247 Ga. 612, 277 S.E.2d 678, 682 (1981); People v. DeJesus, 71 Ill. App.3d 235, 27 Ill.Dec. 448, 449, 389 N.E.2d 260, 261 (1979); State v. Conlogue, 474 A.2d 167, 173 (Me. 1984); Commonwealth v. Labbe, 6 Mass. App. 73, 373 N.E.2d 227, 230 (1978); People v. Barnard, 93 Mich. App. 590, 286 N.W.2d 870, 871 (1979); State v. Loss, 295 Minn. 271, 204 N.W.2d 404, 409 *660 (1973); State v. Taylor, 163 Mont. 106, 515 P.2d 695, 703 (1973); People v. Henson, 33 N.Y.2d 63, 349 N.Y.S.2d 657, 664-665, 304 N.E.2d 358, 363-364 (1973); Bludsworth v. State, 98 Nev. 289, 646 P.2d 558, 559 (1982); State v. Wilkerson, 295 N.C. 559, 247 S.E.2d 905, 911 (1978); Ashford v. State, 603 P.2d 1162, 1164 (Okl.Crim. App. 1979); Commonwealth v. Rodgers, 364 Pa.Super. 477, 528 A.2d 610, 613-614 (1987), appeal denied, 518 Pa. 638, 542 A.2d 1368 (1988); State v. Best, 89 S.D. 227, 232 N.W.2d 447, 458 (1975); State v. Tanner, 675 P.2d 539, 545 (1983), superseded on other grounds, 743 P.2d 191, 193 (Utah 1987); State v. Toennis, 52 Wash. App. 176, 758 P.2d 539, 545, review denied, 111 Wash.2d 1026 (1988).
Even if we determined that the trial judge had improperly recognized BCS as a reliable scientific basis for admission of expert testimony tending to show absence of accident or mistake, and we do not, any such error was harmless. Evidence of prior episodes of child abuse unconnected with the direct cause of the child's death was admissible as proof of absence of accident or mistake. State v. Wright, 66 N.J. 466, 468, 332 A.2d 606 (1975), rev'g on dissent, 132 N.J. Super. 130, 148, 332 A.2d 614 (App.Div. 1974) (Allcorn, J.A.D., dissenting); State v. Elmore, 205 N.J. Super. 373, 384, 500 A.2d 1089 (App.Div. 1985); see State v. Wilson, 158 N.J. Super. 1, 5, 385 A.2d 304 (App.Div.), certif. denied, 79 N.J. 473, 401 A.2d 229 (1978). The trial judge here could properly have admitted Dr. Catherman's testimony without regard to the BCS characterization as proof of prior abuse at the hands of Moorman to rebut her contention that Labria had fallen down stairs.

II.
The decision to admit evidence of prior crimes or bad acts resides in the sound discretion of the trial judge, see State v. Kelly, supra, 97 N.J. at 215, 478 A.2d 364 (citing State v. Sands, 76 N.J. 127, 144, 386 A.2d 378 (1978)), and is not disturbed absent a showing of its mistaken exercise, such as when there is a "clear error of judgment," State v. Koedatich, 112 N.J. 225, 313, 548 A.2d *661 939 (1988), cert. denied, 488 U.S. 1017, 109 S.Ct. 813, 102 L.Ed.2d 803 (1989).
N.J.R.E. 404(b) provides:
Evidence of other crimes, wrongs, or acts is not admissible to prove the disposition of a person in order to show that he acted in conformity therewith. Such evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute.
In order to be admissible, the party offering the evidence must prove that the "other crime" or prior bad act evidence is: (1) relevant to a genuinely disputed material issue; (2) similar in kind and reasonably close in time to the one for which the defendant is being tried; (3) clear and convincing; and, (4) dispositive because its probative value is not outweighed by prejudice to the defendant. State v. Cofield, 127 N.J. 328, 338, 605 A.2d 230 (1992). When balancing the probative value against possible undue prejudicial impact, the court considers whether the case can be served by other, less prejudicial evidence. State v. Stevens, 115 N.J. 289, 303, 558 A.2d 833 (1989).
If the parties dispute the occurrence of a prior bad act, a plenary evidentiary hearing (see N.J.R.E. 104) is held to determine whether the prior bad act occurred, and whether the party against whom the evidence is sought to be admitted actually committed the prior bad act. See, e.g., Burbridge v. Paschal, 239 N.J. Super. 139, 155, 570 A.2d 1250 (App.Div.) (prior bad act evidence improperly admitted where there was no evidence introduced at plenary hearing depicting that prior damage to plaintiffs' yard was actually caused by defendant junkyard operator), certif. denied, 122 N.J. 360, 585 A.2d 369 (1990). If such evidence is admitted at trial, the judge must give the jury an instruction limiting the use of the evidence so that it is not used as evidence of the defendant's propensity to commit the crime. See State v. Cofield, supra, 127 N.J. at 341, 605 A.2d 230.
There was no mistaken exercise of discretion in the trial judge's allowing Dr. Catherman's BCS testimony as prior bad act *662 evidence to demonstrate Labria's death was not owing to accident or mistake. The criteria set forth in Cofield were satisfied.
Evidence of prior mechanical, physical abuse of Labria was relevant to demonstrate that her death was not due to her falling down stairs. Such evidence was similar in kind and close in time to the evidence presented to support the instant charges. Dr. Catherman observed that the varied age and nature of the internal and external injuries indicated a pattern of abuse.
The State presented clear and convincing evidence that the BCS had occurred. Although the fact that Labria was a victim of BCS was disputed, the judge, after a Rule 104 hearing, correctly determined that there was sufficient basis for the jury to conclude that the BCS had actually occurred, and that defendant Moorman was responsible for it. In so deciding, the court could also have taken into account the hospital physician's testimony during her voir dire and before the jury that the injuries Labria had suffered were not indicative of falling down stairs or suffering from colds or fevers.
Furthermore, the State produced clear and convincing evidence that Moorman was the source of Labria's injuries. In her taped statement to Sergeant Muzyczek and Inspector Latham, Moorman admitted that she was Labria's sole custodian, and that her friend Rodney Rodgers, the only other person with whom Labria came into daily contact, never disciplined, hit, or hollered at Labria. She also admitted that she occasionally disciplined Labria harshly when angered over her relationship with Rodgers, although insisting that she never intended to hurt Labria.
Finally, the trial judge properly determined that the probative value of the evidence outweighed any prejudicial impact of the BCS testimony. The BCS evidence was proffered to refute defendant's contention that Labria had fallen down stairs. No other evidence was available to disprove Moorman's assertion. Indeed, physical abuse most often occurs while the child is in parental custody beyond public view and cannot be proven without evidence of a pattern or history of abuse. Cf. People v. Henson, *663 supra, 349 N.Y.S.2d at 665, 304 N.E.2d at 364; State v. Loss, supra, 204 N.W.2d at 409; People v. Jackson, supra, 95 Cal. Rptr. at 921.
The fact that there was no direct evidence linking defendant to the battery, or that Dr. Catherman could not identify the perpetrator of the abuse, is irrelevant. To admit its prior bad act evidence to disprove defendant's contention, the State was only obligated to produce clear and convincing evidence of defendant's involvement in Labria's death. The jury could fairly have inferred that a victim of BCS could not have sustained repeated injuries of a similar nature except at the hand of the child's primary caretaker. See People v. Henson, supra, 349 N.Y.S.2d at 665, 304 N.E.2d at 364; People v. Jackson, supra, 95 Cal. Rptr. at 921. The State presented at voir dire defendant's statement as evidence that she was Labria's sole caretaker. Subsequently, the State produced corroborating evidence of Moorman's link to Labria's death through her statement that she had neither intended to kill Labria nor wanted to go to jail. Unlike State v. Cofield, the trial judge here gave a thorough limiting instruction and repeated this instruction during the main jury charge immediately after the BCS testimony was admitted.

III.
We consider the sentence imposed to be manifestly appropriate. There was no mistaken exercise of sentencing discretion. See State v. Ghertler, 114 N.J. 383, 555 A.2d 553 (1989); State v. Roth, 95 N.J. 334, 471 A.2d 370 (1984).
Affirmed.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 478-479, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694, 726 (1966).
[2] Pretrial motions addressed the admissibility of Moorman's statement and the accuracy of the typed transcript of the recorded statement.
[3] His credentials included testifying between fifty and one hundred times regarding victims suffering from BCS, lecturing since 1971 on BCS to county coroners and medical examiners throughout the nation, and conducting seminars for local law enforcement agencies regarding BCS.
[4] According to Dr. Catherman, the victim frequently presents recently healed skeletal injuries as well. Neither a designated number or type of injury nor a fatality are "required" to reach a finding that a child has suffered from BCS. Dr. Catherman cited to other factors, including the extent and location of external injuries, the formation of a pattern among those injuries, the existence of internal injuries, and the delayed presentment of the child for treatment.
[5] There is no dispute that BCS is widely accepted in the medical profession. Thus, we only address the issue of reliability.
[6] See, e.g., Brown, Battered Child Syndrome, 21 J. of Forensic Sci. 65 (1976); Hicks, Admissibility of Expert Testimony on the Psychology of the Battered Child, 11 Law & Psychol. Rev. 103 (1987); McCoid, The Battered Child and Other Assaults upon the Family: Part One, 50 Minn.L.Rev. 1 (1965); Myers, et al., Expert Testimony in Child Sexual Abuse Litigation, 68 Neb.L.Rev. 1 (1989); and, Orfinger, Battered Child Syndrome: Evidence of Prior Acts in Disguise, 41 Fla.L.Rev. 345 (1989).
[7] The doctor referred to several authoritative sources, which included: Fossum & Descheneaux, Blunt Trauma of the Abdomen in Children, 36 J. of Forensic Sci. 47 (Jan. 1991); Kempe, et al., The Battered-Child Syndrome, 181 JAMA 17 (1962); Sivit, Taylor & Eichelberger, Visceral Injury in Battered Children: A Changing Perspective, 173 Radiology 659 (Dec. 1989); Touloukian, Abdominal Visceral Injuries in Battered Children, 42 Pediatrics 642 (Oct. 1968); and, Zumwald & Hirsch, Pathology of Fatal Child Abuse and Neglect, in Helfer & Kempe, The Battered Child 247 (4th ed. 1987).