# RECORD IMPOUNDED

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2456-19

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

ANDREW HOWARD-FRENCH,

    Defendant-Appellant.

_____

**APPROVED FOR PUBLICATION**

**August 5, 2021**

**APPELLATE DIVISION**

Submitted March 10, 2021 – Decided August 5, 2021

Before Judges Sumners, Geiger and Mitterhoff.

On appeal from the Superior Court of New Jersey, Criminal Division, Hudson County, Indictment No. 18-10-0872.

Miller, Meyerson & Corbo, attorneys for appellant (Gerald D. Miller, on the briefs).

Esther Suarez, Hudson County Prosecutor, attorney for respondent (Erin M. Campbell, Assistant Prosecutor, on the brief).


The opinion of the court was delivered by

SUMNERS, JR., J.A.D.

Tried by a jury, defendant Andrew Howard-French was found guilty of first-degree murder, N.J.S.A. 2C:11-3(a)(1) and (2); second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(2); and third-degree endangering an injured victim, N.J.S.A. 2C:12-1.2(a). The offenses arose from the death of a twenty-three-month-old child who was under defendant's care. Defendant was sentenced to an aggregate prison term of life subject to an eighty-five percent parole ineligibility followed by a consecutive five-year prison term.

Defendant argues:

POINT I

IT WAS ERROR TO HAVE PERMITTED EVIDENCE CONCERNING WRONGFUL ACTS WHICH [DEFENDANT] WAS NOT CHARGED IN THE INDICTMENT.

A. There Was No Clear and Convincing Evidence That [Defendant] Had Committed A Wrongful Act on July 11, 2018.

B. Evidence Relating to Injuries On July 16, 2018 Should Not Have Been Admit[t]ed Into Evidence Because It Had Not Been Part of the Rule 404[1] Hearing. (Not Raised Below).

C. The Doctor's Speculative Testimony Concerning July 16, 2018 Injuries Should

---

[1] N.J.R.E. 404(b).

[Have] Been Stricken Because It Was Not Based on Reasonable Med[i]cal Certainty. (Not Raised Below).

D. Dr. Sultana's Testimony About July 16, 2018 Did Not Meet the Clear and Convincing Test. (Not Raised Below).

POINT II

WHEN EVIDENCE OF THE JULY 11, 2018 CONDUCT AND WHEN EVIDENCE BY DOCTOR SULTANA CONCERNING ABUSE ON JULY 16, 2018 WAS PRESENTED[,] LIMITING INSTRUCTIONS SHOULD HAVE BEEN GIVEN. (Not Raised Below).

POINT III

IT WAS ERROR FOR THE JUDGE IN HIS CHARGE TO THE JURY TO FAIL TO GIVE ANY LIMITING INSTRUCTION CONCERNING DR. SULTANA'S TESTIMONY OF EARLIER CHILD ABUSE INJURIES. (Not Raised Below).

POINT IV

THE TESTIMONY THAT THE MANNER OF DEATH WAS HOMICIDE SHOULD HAVE BEEN STRICKEN AND THE JURY TOLD TO DISREGARD IT. (Not Raised Below).

POINT V

THE RECORDED STATEMENT OF THE DEFENDANT SHOULD HAVE BEEN SANITIZED TO ELIMINATE IMPROPER COMMENTS BY THE

INTERROGATING POLICE OFFICER.  (Not Raised Below).

POINT VI

THE COURT ERRONEOUSLY ADVISED THE JURY THAT THE DEFENDANT HAD FLED THE SCENE.  (Not Raised Below).

POINT VII

THE COURT ERRONEOUSLY INSTRUCTED THE JURY ON THE CRIME OF ENDANGERING AN INJURED PERSON.  (Not Raised Below).

POINT VIII

THE COURT FAILED TO CHARGE THE AFFIRMATIVE DEFENSE OF SUMMONING MEDICAL TREATMENT.  (Not Raised Below).

POINT IX

THE COURT SHOULD HAVE GRANTED THE MOTION TO DISMISS THE CHARGE OF ENDANGERING AN INJURED PERSON.

POINT X

[DEFENDANT] WAS DEPRIVED OF EFFECTIVE ASSISTANCE OF COUNSEL.  (Not Raised Below).

We conclude there is no merit to any of defendant's arguments and affirm.

A-2456-19

## I.

In July 2018, Monique Sparrow, mother of twenty-three-month-old Bryce and a seven-year-old daughter, worked weekdays from 2:00 p.m. to 10:30 p.m. While Sparrow worked, either her brother, or defendant and his girlfriend, Monique Dugan, would care for the children.

On July 11, 2018, defendant was caring for Bryce when he claimed that Bryce fell down the stairs of Dugan's apartment building while running after his mother. Later that day, defendant sent Sparrow a text message regarding the alleged fall, stating: "I know you're mad[,] but it wasn't my intention, of course, it just happened, too bad." At trial, the State refuted defendant's claim by showing a surveillance video from the apartment building's lobby depicting defendant and Bryce walking into the building, followed by defendant taking Bryce out of the stroller and carrying him up the stairs without Bryce falling at any point. The video was admitted into evidence by the motion judge, who did not preside over the trial, in response to the State's pretrial N.J.R.E. 404(b) motion.

Five days later, on July 16, when Sparrow dropped Bryce off at daycare at approximately 8:30 a.m., the daycare teacher described Bryce as happy and affectionate, and she did not notice any bruising or injuries on him when

A-2456-19

changing his diaper. In the afternoon, Dugan picked up Bryce from daycare and claimed that he was not acting normal; he was hot, and he had a cut on his ear. Between 11:40 p.m. and 11:50 p.m., Sparrow picked up Bryce from defendant and Dugan's apartment. When she got home, Sparrow noticed Bryce had a swollen and bruised white lip, and bruises on the back of his left ear and head, so she took him to the emergency room at the Jersey City Medical Center (JCMC).

In the early morning of July 17, Bryce was treated at JCMC by Dr. Noushin Sultana. According to Sparrow, the doctor believed the bruising was "self-inflict[ed]," caused by "kids [being] clumsy" and "probably . . . bump[ing] into something." Dr. Sultana testified she also noticed "several scratch marks" on Bryce's stomach but could not recall if she examined Bryce's leg and back. She stated that if she had seen injuries on Bryce's body suggestive of abuse, she would have reported it to the state authorities. Based on Dr. Sultana's assessment, Sparrow had no concern with defendant continuing to care for Bryce and left him with defendant that afternoon before she went to work.

Later that afternoon, defendant took Bryce to a local playground. He testified that while walking back to his apartment building, he noticed that

6

Bryce hurt his leg and was having difficulty walking, which he attributed to Bryce refusing to go down a slide, and instead jumping off the slide. With Bryce both walking on his own and being carried by defendant, they returned to the apartment at approximately 1:17 p.m. Defendant stated he gave Bryce some water, put a cool rag on his head, and noticed that his breathing was abnormal. Defendant then telephoned Dugan and gave Bryce cardiopulmonary resuscitation (CPR); Bryce threw up water and a moving organism. Defendant also called Sparrow, but she did not answer her phone.

Surveillance video revealed that at 1:40 p.m., defendant left the apartment building alone, and returned at 2:24 p.m. He left again, alone, at 2:32 p.m. He paced in front of the apartment building while talking on his cell phone, and returned inside at 2:34 p.m. At 2:41 p.m., he exited for a third time, this time with another person—another child in his care[2]—and returned inside a minute later. At 2:47 p.m., defendant was in the building lobby when Dugan arrived.

Dugan testified she could not remember if Bryce was breathing when she first arrived, so she slapped his back to see if he would respond. She stated

---

[2] The child was D.M., who was unrelated to anyone involved in this matter.

A-2456-19

she then put Bryce into the bathtub with cool water and got into the tub with him. He was breathing heavily, and his eyes rolled back.

It was not until 2:52 p.m. that defendant called 9-1-1 seeking aid for Bryce. First responders Allan Pereira, a JCMC Basic Life Support certified emergency medical technician (EMT), and his partner, Luis Rivera Ordaz, an EMT, responded to the call. Defendant met them on the street and led them to the apartment where Dugan was performing CPR on Bryce. According to Pereira, Bryce was non-responsive to any stimuli, was not breathing, and had no pulse. Pereira and Ordaz proceeded to ventilate him and administered CPR for approximately half an hour. After that was unsuccessful, they then used a defibrillator on Bryce but were unable to restore his heartbeat.

David Pernell, an advanced cardiac life support certified paramedic from the JCMC, also arrived at the scene with his partner at 2:54 p.m. Pernell noticed multiple bruises on Bryce and a broken, snapped in half femur. Bryce was taken to JCMC, where he was later pronounced dead.

Two Jersey City Police Officers arrived at the scene at approximately 4:00 p.m. Twenty minutes later, Jersey City Police Juvenile Division Detective Miguel Rivera arrived at the scene and asked defendant what happened. Defendant told Rivera he was babysitting Bryce, and when they

went to a park, Bryce fell off the slide but did not hit his head. He also said he called 9-1-1 because Bryce was not responding to him.

The investigation was turned over to the Hudson County Prosecutor's Office (HCPO). Defendant was taken to the HCPO to be interviewed. After being read his Miranda[3] rights, he agreed to speak with Detective Brenton Porter and his partner Detective Trillion.[4] Defendant repeated his account of what he previously told Rivera. Defendant stated he did not notice any bruises on Bryce. He also stated he never disciplined Bryce.

Multiple times during the recorded interview, Porter implied that he did not believe defendant's account of what happened. Porter stated:

> Well, what we're saying is like with that amount of bruising, in my opinion, I think it's almost – you said when you changed his diaper and you said you didn't see any bruising, I don't – it's almost impossible not to see that amount of bruising.
>
> . . . .
>
> So at that point, what we're saying is you didn't notice all this bruising. I mean it's pretty heavy bruising even if you're trying not to be a creep because like, no, I get it you're not like . . . . you know, fucking with little kids, I understand that, I'm just saying that, you

---

[3] Miranda v. Arizona, 384 U.S. 436 (1966).

[4] Detective Trillion's first name is not mentioned in the record.

A-2456-19

know, I gotcha.  But you're going to notice . . . that's what I'm kind of getting at.

. . . .

[W]hen I stop and think about it and we step out of the room and we sit there and you kind of think about it for a second and we retell it [to] our bosses or whatever, it doesn't seem to be adding up.

. . . .

[T]hat's another thing I'm saying like, oh, what – that's part of what's not adding up, is like how can you change the kid's diaper and [not] see it, like you're – you change the child's diaper, you're going to see those bruises.  That's all.  That's all I'm getting at is there's a lot of bruises that are there.

After defendant completed his statement, the detectives took him home.  Eight days later, defendant was arrested and charged with Bryce's death.

At trial, the State presented forensic pathology expert testimony by Jacqueline Benjamin, M.D., a forensic pathologist and neuropathologist at the Bergen Region Medical Examiner's Office, who performed an autopsy on Bryce before defendant's arrest.  Dr. Benjamin testified that she found signs of medical intervention on the body and detailed the many contusions and abrasions she observed.  She further described a fracture on the right femur and stated that it takes a bit more force to fracture the bones of a child; she also noted that a child with a fractured femur would typically be unable to

10

walk. She also dissected the abdominal cavity and found bleeding in the rectus muscle, the lining of the abdomen, and the abdominal cavity itself. There was also a laceration in the fatty tissue that is attached to the transverse colon that is typically caused by force or a blow.

Dr. Benjamin opined the cause of death was homicide caused by multiple blunt force injuries. She determined the death was not natural, indeterminate, a suicide, or an accident. She opined that if someone suffered a subarachnoid cerebral hemorrhage at 12:30 p.m., the person could still possibly be conscious and walking at 1:15 p.m. She acknowledged that some of the injuries could have been caused by an inexperienced person performing CPR, but she did not believe that the injuries were from a simple fall. Dr. Benjamin also stated it was possible that the injuries causing Bryce's subarachnoid cerebral hemorrhage were incurred an hour and a half prior to 1:15 p.m. on the day of his death.

At the close of the State's case, defendant unsuccessfully moved for a judgment of acquittal on the charges of both murder and endangering an injured victim. As for the latter charge, the judge found that, based upon the State's evidence, the jury could reasonably find that he left the scene while Bryce needed care.

11

A-2456-19

The jury found defendant guilty of murder, endangering the welfare of a minor, and endangering an injured victim. Defendant was later sentenced to life imprisonment subject to an eighty-five percent parole ineligibility for murder, concurrent to ten years for endangering the welfare of a minor, followed by a consecutive five-year prison term for endangering an injured victim.

## II.

We first address defendant's arguments related to the trial judge's admission of: his prior bad acts; the opinion testimony of Dr. Sultana; the non-sanitized statement by Porter accusing defendant of lying; and Dr. Benjamin's testimony regarding Bryce's cause of death. Before analyzing each argument, we start with the well-established principle that a trial judge's evidential rulings are entitled to a strong degree of deference and are reviewed under an abuse of discretion standard. See State v. Prall, 231 N.J. 567, 580 (2018). Such rulings are therefore upheld unless "there has been a clear error of judgment." State v. J.A.C., 210 N.J. 281, 295 (2012) (quoting State v. Brown, 170 N.J. 138, 147 (2001)). "An appellate court applying this standard 'should not substitute its own judgment for that of the trial court, unless the trial

12

[judge's] ruling is so wide of the mark that a manifest denial of justice resulted.'" Ibid. (quoting Brown, 170 N.J. at 147) (internal quotation omitted).

Furthermore, where a defendant—as in this case—did not object before the trial judge to the admission of evidence, it must be shown that there was "plain error clearly capable of producing an unjust result." State v. Bunch, 180 N.J. 534, 541 (2004) (quoting State v. Afanador, 151 N.J. 41, 54 (1997)); R. 2:10-2. A reversal based on plain error requires us to find that the error likely led to an unjust result that is "sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." State v. Williams, 168 N.J. 323, 336 (2001) (quoting State v. Macon, 57 N.J. 325, 336 (1971)).

A. Prior Bad Acts

In Point I, defendant argues the motion judge improperly admitted the July 11, 2018 surveillance video showing defendant and Bryce walking into Dugan's apartment building and him taking Bryce out of the stroller and carrying him up the stairs. The State showed the video to establish defendant was lying when he claimed that Bryce fell down the stairs chasing after his mother. Defendant contends the State failed to satisfy the third prong of the

Cofield [5] test requiring proof that the video showed clear and convincing evidence of prior bad acts. He contends he did not admit to harming Bryce on July 11, and no expert testified that Bryce had pre-existing injuries prior to his death that were the result of abuse. Defendant asserts that because there was no testimony about what caused the injuries on July 11, a jury should not have been allowed to infer that he lied about what occurred that date. He also asserts that the jury should not have been allowed to infer that if he lied about the July 11 incident, he also lied about what occurred when Bryce died on July 17. We are unpersuaded.

N.J.R.E. 404(b)(2) provides that evidence of other crimes or bad acts is generally not admissible, unless used for "proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute." The apprehension in admitting evidence of other crimes is that "the jury may convict the defendant because he [or she] is a bad person in general." Cofield, 127 N.J. at 336 (internal quotation marks and citation omitted). The evidence is not required to prove or disprove a fact at issue but need only support a desired inference. State v. Swint, 328 N.J. Super. 236, 252-53 (App. Div. 2000).

---

[5] State v. Cofield, 127 N.J. 328 (1992).

In Cofield, our Supreme Court set forth a four-pronged test to govern the admission of such evidence:

> 1. The evidence of the other crime must be admissible as relevant to a material issue;
>
> 2. It must be similar in kind and reasonably close in time to the offense charged;
>
> 3. The evidence of the other crime must be clear and convincing; and
>
> 4. The probative value of the evidence must not be outweighed by its apparent prejudice.
>
> [127 N.J. at 338 (quoting Abraham P. Ordover, Balancing the Presumptions of Guilt and Innocence: Rules 404(b), 608(b) and 609(a), 38 Emory L.J. 135, 160 (1989) (footnote omitted)); see also State v. Carlucci, 217 N.J. 129, 140-41 (2014) (reaffirming the Cofield test).]

In granting the State's motion to admit evidence of prior bad acts, the judge correctly pointed out that there was "clear and convincing evidence that Bryce['s] . . . fatal injuries were sustained while he was under the care of [] defendant" and that he "suffered some injuries prior to [his death on] July 17, although it cannot be said . . . that those prior injuries were consistent with . . . [battered child syndrome] and the State does not appear to make such an argument." Finding the surveillance video provided clear and convincing evidence that defendant lied to Sparrow about the bruising on Bryce's face and

stomach being caused by a fall on July 11, the judge properly found it admissible under Cofield.

Contrary to defendant's contention before us, the cases relied upon by the motion judge, State v. Compton, 304 N.J. Super. 477, 482 (App. Div. 1997), State v. Moorman, 286 N.J. Super. 648, 657 (App. Div. 1996), and Estelle v. McGuire, 502 U.S. 62, 72 (1991), supported her ruling. In Compton, we affirmed the admission of evidence of prior similar acts of child abuse to rebut defendant's claim that the child's death was accidental. 304 N.J. Super. at 482. In Moorman, we held that "prior episodes of child abuse unconnected with the direct cause of the child's death [were] admissible as proof of absence of accident or mistake." 286 N.J. Super. at 660. In Estelle, the United States Supreme Court held that "[w]hen offered to show that certain injuries are a product of child abuse, rather than accident, evidence of prior injuries is relevant even though it does not purport to prove the identity of the person who might have inflicted those injuries." 502 U.S. at 68.

Bryce did not have any body bruises on the morning of July 11, when Sparrow dropped him off to defendant, and defendant was the sole caretaker during that day. That evening, Sparrow noticed bruises on Bryce. Thus, there was clear and convincing evidence from the video for the jury to consider

16

whether defendant lied that Bryce fell and that he was not responsible for Bryce's injuries, which in turn could show that the fatal injuries Bryce incurred six days later were not the result of an accident as defendant claimed.

B. Dr. Sultana's Testimony

Defendant argues the judge should have held a pretrial hearing to decide whether Dr. Sultana could testify about Bryce's injuries, which were attributed to some sort of blunt trauma, that she did not observe during her examination of him on July 17, 2018, but were depicted in photos taken by his mother on July 11. The doctor testified that had she seen them, she would have reported them as indicative of child abuse. Defendant asserts Dr. Sultana's testimony that Bryce was not injured before being left in his care on July 17, was mere speculation and not an opinion based on reasonable medical certainty. He argues because there was no clear and convincing evidence that he caused Bryce's fatal injuries on July 16, her testimony does not satisfy Cofield's third prong. Relying on State v. Barden, 195 N.J. 375, 390 (2008) and State v. Fortin, 162 N.J. 517, 534 (2000), defendant also contends the judge should have given a limiting instruction to the jury regarding other crimes' evidence when the July 11 testimony was presented and when Dr. Sultana testified that Bryce showed signs of abuse, as well as in the final jury charges. Defendant

17

acknowledges that because these arguments were not raised before the judge, they must be considered under the plain error standard.

We conclude no plain error occurred. Dr. Sultana testified as a fact witness: a physician treating Bryce's lip injury. She did not opine that the injury was caused by abuse. In fact, she believed the injury was self-inflicted by Bryce being "clumsy." Given that she was not providing expert testimony, her testimony did not have to be based on a reasonable degree of medical certainty. See Delvecchio v. Twp. of Bridgewater, 224 N.J. 559, 563 (2016) (holding that the trial court has the authority to "admit the testimony of a treating physician regarding the diagnosis and treatment of a patient" without qualifying the doctor as an expert); Stigliano by Stigliano v. Connaught Lab'ys, Inc., 140 N.J. 305, 314 (1995) (citation omitted) ("Because the determination of the cause of a patient's illness is an essential part of diagnosis and treatment, a treating physician may testify about the cause of a patient's disease or injury.")

Dr. Sultana's testimony that bruises depicted in a photo of Bryce's back were suggestive of abuse from blunt trauma was not offered by the State to show evidence of other bad acts. The testimony was presented to show Dr. Sultana had not noticed the injuries when she examined Bryce on the morning

18

prior to his death. In fact, defense counsel's cross of the doctor brought out her remarks that, had she seen the injuries, she would have reported them as abuse. Under these circumstances, there was no need for a <u>Cofield</u> analysis, nor any limiting instructions.

C. <u>Defendant's Statements to Law Enforcement</u>

Defendant argues there was plain error by the trial judge's failure to sanitize portions of his recorded statement where Porter told defendant that he did not believe defendant's account of Bryce's park accident. Relying on <u>Barden</u>, 195 N.J. at 390, and case law from other states,[6] defendant maintains this was prejudicial because allowing the jury to hear the officers' testimony was tantamount to the officers testifying that they did not believe him. We disagree.

Law enforcement officers have been afforded reasonable latitude in interrogating a suspect "as long as the will of the suspect is not overborne." <u>State v. Miller</u>, 76 N.J. 392, 403 (1978). In fact, our courts "have permitted

---

[6] Defendant also cites an unreported decision from our court. An unreported decision does not constitute precedent. <u>R.</u> 1:36-3. It is improper to cite and rely upon an unreported decision except as allowed by <u>Rule</u> 1:36-3.

the use of trickery in interrogations." State v. Patton, 362 N.J. Super. 16, 31 (App. Div. 2003).

Here, Porter's questioning of the veracity of defendant's account of what happened to Bryce was a legitimate exercise of police authority and allowing the jury to hear it provided context to the interrogation. Porter's accusation that defendant was not truthful constituted an important tool in his effort to obtain a true account of Bryce's death. The statements were not offered to persuade the jury that defendant was lying to Porter as neither Porter nor any other law enforcement officer testified at trial that they did not believe defendant's account. Doing so would have been improper and inadmissible. The judge made it clear to the jury that it was obligated to determine the credibility of the witnesses and the statements admitted into evidence. Defendant's reliance on Barden is misguided as the case governs the admission and sanitization of other-crimes evidence. See 195 N.J. at 390. We discern no unjust result in allowing the jury to consider Porter's comments to defendant that he did not believe defendant was telling the truth. Defendant has not shown there is anything in the record suggesting the jury relied on the detective's comments or that redaction of them would have changed the outcome of the trial.

20

D. Dr. Benjamin's Testimony Regarding Manner of Death

Defendant argues Dr. Benjamin failed to opine with a reasonable degree of medical certainty that the manner of Bryce's death was homicide. State v. Harvey, 121 N.J. 407, 431 (1990); State v. Freeman, 223 N.J. Super. 92, 116 (App. Div. 1988). Not objecting to the doctor's opinion at trial, defendant asserts plain error occurred because the judge should have sua sponte struck the testimony and advised the jury to disregard it. We disagree.

Dr. Benjamin was qualified as an expert in forensic pathology. In accordance with N.J.R.E. 705, she was able to testify "in terms of opinion or inference and give reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise." Dr. Benjamin opined that Bryce's death was homicide. A medical expert may opine that a death was a "homicide" in order to rule out the possibility that a victim's injuries were accidental. See State v. Baluch, 341 N.J. Super. 141, 185 (App. Div. 2001). Thus, Dr. Benjamin's testimony was "the functional equivalent of ruling out the possibility that [Bryce's] multiple injuries were self-inflicted or sustained as a result of mere inadvertence (i.e., accident)." Ibid.

"[M]edical-opinion testimony must be couched in terms of reasonable medical certainty or probability; opinions as to possibility are inadmissible."

21

Johnesee v. Stop & Shop Cos., 174 N.J. Super. 426, 431 (App. Div. 1980). However, the certainty requirement does not oblige experts to use "'talismanic' or 'magical words,'" so long as the court is "persuaded that 'the doctor was reasonably confident of'" the opinion. Eckert v. Rumsey Park Assocs., 294 N.J. Super. 46, 51 (App. Div. 1996) (quoting Aspiazu v. Orgera, 205 Conn. 623, 635 (Conn. 1987)); see also id. at 52 (stating that opinion as to causation will not "be satisfied by a single verbal straightjacket alone, but, rather, by any formulation from which it can be said that the witness' 'whole opinion' reflects an acceptable level of certainty") (quoting Matott v. Ward, 399 N.E.2d 532, 534 (N.Y. 1979)). Taken as a whole, Dr. Benjamin's testimony reflects the requisite degree of certainty, despite not stating the "magic words" that her opinion was within a reasonable degree of medical certainty.

The judge properly instructed the jury that it was "not bound to accept the expert's opinion" and may "accept it or reject it" pursuant to State v. Berry, 140 N.J. 280, 292 (1995). Thus, there was no unjust result in allowing Dr. Benjamin to opine that Bryce's death was due to homicide without giving her opinion within a reasonable degree of medical certainty.

Defendant argues the trial judge should not have used the word "flight" in the jury charge regarding the offense of endangering an injured victim. The judge stated:

> The third . . . element the State must prove beyond a reasonable doubt is that the defendant left the scene of the injury knowing or reasonably believing that the injured person, Bryce Sparrow, was physically helpless, or mentally incapacitated, or otherwise unable to care for himself at that time. The State need not prove the defendant's flight increased risk that further harm would come to the victim.
>
> [(Emphasis added.)]

Defendant maintains there was no evidence of flight because he remained at the building and merely left the apartment to wait for Dugan and EMT responders to arrive. He contends he was prejudiced because "the jury may have inferred that the [judge] was finding [he] fled and therefore he had a guilty mind." Although counsel did not object, he contends the judge's confusing "departure" with "flight" prejudiced him as there was no evidence that there was any flight. There is no merit to defendant's contention.

"[I]nsofar as consistent with and modified to meet the facts adduced at trial, model jury charges should be followed and read in their entirety to the jury." State v. R.B., 183 N.J. 308, 325 (2005). The use of the word "flight" in

23

the judge's charge was taken verbatim from the Model Jury Charges (Criminal), "Endangering Injured Victim (N.J.S.A. 2C:12.12)" (rev. Mar. 14, 2016). It was presumptively proper, State v. Whitaker, 402 N.J. Super. 495, 513-14 (App. Div. 2008), and defendant has not shown that the use of the term "flight" in the charge "possessed a clear capacity to bring about an unjust result[,]" State v. Nero, 195 N.J. 397, 407 (2008) (citation omitted).

IV.

Defendant raises two arguments to reverse his conviction for endangering an injured victim. First, he argues that although he did not request the jury be instructed on the affirmative defense of summoning medical treatment under N.J.S.A. 2C:12-1.2(c), the judge should have sua sponte given the instruction. The statute provides:

> It is an affirmative defense to prosecution for a violation of this section that the defendant summoned medical treatment for the victim or knew that medical treatment had been summoned by another person, and protected the victim from further injury or harm until emergency assistance personnel arrived. This affirmative defense shall be proved by the defendant by a preponderance of the evidence.
>
> [N.J.S.A. 2C:12-1.2(c).]

Defendant contends the ample evidence that he summoned medical treatment warranted the instruction to establish that he was not guilty of endangering an

injured victim.  See State v. Blanks, 313 N.J. Super. 55, 63-64 (App. Div. 1998).

In addition, defendant argues the judge erroneously failed to grant his motion to dismiss the charge of endangering an injured victim at the end of the State's case.  He points out he called 9-1-1 and did not leave the apartment building—only departing the apartment to wait outside for Dugan and the EMTs to arrive—as undisputed facts that he sought aid for a non-responsive Bryce.

None of these arguments have merit.  To justify the affirmative defense of summoning medical treatment, defendant not only would have to show there was evidence that he obtained medical assistance but also that he "protected [Bryce] from further injury or harm until emergency assistance personnel arrived."  N.J.S.A. 2C:12-1.2(c).  The surveillance video demonstrates that defendant left Bryce alone for forty-four minutes (1:40 p.m. to 2:24 p.m.) after they returned to the apartment while Bryce was apparently injured and did not call 9-1-1 until an hour and twelve minutes (1:40 p.m. to 2:52 p.m.) after they returned to the apartment.  Leaving an injured twenty-three-month-old Bryce without adult supervision cannot reasonably be viewed as protecting the child.  Defendant offered no proof that he protected Bryce to justify the affirmative

A-2456-19

defense of summoning medical treatment. Thus, no unjust result occurred because the jury was not instructed on the affirmative defense.

Moreover, because there was sufficient evidence that defendant endangered Bryce by leaving him alone in the apartment while he was injured, the judge did not err in failing to grant defendant's motion to dismiss the charge of endangering an injured victim. See State v. Reyes, 50 N.J. 454, 458-59 (1967) (citing State v. Fiorello, 36 N.J. 80, 90-91 (1961) (granting a motion for judgment of acquittal only if, viewing all the evidence in the light most favorable to the State, "as well as all of the favorable inferences which reasonably could be drawn therefrom," no "reasonable jury could find guilt of the charge beyond a reasonable doubt")).

V.

Finally, defendant argues that he was denied effective assistance of his trial counsel related to the above-noted arguments that counsel failed to object to the admission of evidence—the opinion testimony of Dr. Sultana; the interrogation statements by Porter accusing defendant of lying; and Dr. Benjamin's testimony regarding Bryce's cause of death—and failed to request that the jury consider the affirmative defense of summoning medical treatment.

26

To establish a prima facie case of ineffective assistance of counsel, a defendant "must show that counsel's performance was deficient" and that "the deficient performance prejudiced the defense." State v. Fritz, 105 N.J. 42, 52 (1987) (quoting Strickland v. Washington, 466 U.S. 668, 687 (1984)). Ineffective-assistance claims are more appropriately raised on a petition for post-conviction relief instead of direct appeal. State v. McQuaid, 147 N.J. 464, 484 (1997). Generally, there is a "policy against entertaining ineffective-assistance-of-counsel claims on direct appeal because they generally require examination of evidence outside the trial record." State v. Preciose, 129 N.J. 451, 460 (1992). However, since defendant's ineffective assistance arguments are related to the arguments which we have rejected above, there is no need to examine evidence outside the record for their resolution. Hence, we have considered defendant's ineffective assistance claims and find that they lack merit.

To the extent we have not specifically addressed any of defendant's arguments, we conclude they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

A-2456-19

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-2456-19